STEPHEN R. HARRIS, ESQ.
Nevada Bar No. 001463
HARRIS LAW PRACTICE LLC
6151 Lakeside Drive, Suite 2100
Reno, NV 89511
Telephone: (775) 786-7600
E-Mail: steve@harrislawreno.com

BARBARA L. YONG, ESQ.
Illinois Bar No. 6184000
ROBERT R. BENJAMIN, ESQ.
Illinois Bar No. 0170429
CAREN A. LEDERER, ESQ.
Illinois Bar No. 6244631
BEVERLY A. BERNEMAN, ESQ.
Illinois Bar No. 6189418
ANTHONY J. D'AGOSTINO, ESQ.
Illinois Bar No. 6299589
GOLAN CHRISTIE TAGLIA LLP
70 West Madison Street, Suite 1500
Chicago, IL 60602
Telephone: (312) 263-2300
E-Mail: blyong@gct.law
E-Mail: rrbenjamin@gct.law
E-Mail: calederer@gct.law
E-Mail: baberneman@gct.law
E-Mail: ajdagostino@gct.law

Proposed Attorneys for Debtor

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF NEVADA

* * * * *

| | |
|---|---|
| IN RE:<br><br>SIERRA CHEMICAL CO., a Nevada domestic corporation,<br><br>Debtor. | Case No. 17-51019-btb<br><br>(Chapter 11)<br><br>**EMERGENCY MOTION FOR ORDER (1) AUTHORIZING DEBTOR TO PAY WAGES, SALARIES, BENEFITS, REIMBURSABLE BUSINESS EXPENSES, AND OTHER EMPLOYEE OBLIGATIONS, (2) AUTHORIZING DEBTOR TO PAY CRITICAL VENDORS,** |

1

**AND (3) AUTHORIZING AND DIRECTING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS CHECKS AND TRANSFERS RELATED TO SUCH OBLIGATIONS**

Hearing Date:  OST Pending
Hearing Time:  OST Pending
Est. Time:     15 minutes
Set by:        Judge Beesley

SIERRA CHEMICAL CO., a Nevada domestic corporation (collectively the "Debtor"), by and through its proposed attorneys STEPHEN R. HARRIS, ESQ. of HARRIS LAW PRACTICE LLC and BARBARA L. YONG, ESQ., ROBERT R. BENJAMIN, ESQ., CAREN A. LEDERER, ESQ., BEVERLY A. BERNEMAN, ESQ., and ANTHONY J. D'AGOSTINO, ESQ., of GOLAN CHRISTIE TAGLIA, hereby applies to this Court for entry of an order authorizing the Debtor to (i) pay wages, salaries, garnishments, benefits, reimbursable business expenses, and other employee obligations, including workers' insurance matters, (ii) pay critical vendors, and (iii) authorizing and directing financial institutions to honor and process checks and transfers related to such obligations, all as more specifically set forth herein the points and authorities below, the papers and pleadings on file herein, and any evidence or oral arguments of counsel presented at the time of the hearing on this Motion.

**I.**

**INTRODUCTION**

1. On August 30, 2017 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code.

2. Debtor continues to operate its business and manage its properties as Debtor and Debtor-In-Possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

3. No request has been made for the appointment of a trustee or examiner, and no official committees have yet been established in these cases.

## II.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1134. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (D) and (M).

4. The basis for the relief sough herein are Sections 361 and 363 of the Bankruptcy Code, Fed.R. Bankr. P. 4001 and 6003, and LR 4001.

5. Venue of Debtor's Chapter 11 cases in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.

## BACKGROUND

6. Debtor is in the business of manufacturing and distributing environmental chemicals for municipal, industrial and mining markets, supplying water treatment plants, agricultural facilities and food processors with essential chemicals from its production bases. The headquarters for the Debtor's business is located in Sparks, Nevada, although the Debtor also transacts business in Stockton, California.

## IV.

## RELIEF REQUESTED

7. As of the Petition Date, the Debtor employed approximately 48 full time employees (the "Employees") in the ordinary course of its business. Continued service by the Employees is vital to the Debtor's ongoing business operations and reorganization.

8. As of the Petition Date, the Employees were paid but some of the checks had not cleared the Debtor's payroll bank account in their favor for wages and salaries incurred in the ordinary course of the Debtor's business (the "Wage Obligations"). The total estimated gross amount of Wage Obligations that were paid but still uncleared as of the Petition Date is approximately $52,220.89. Debtor pays its Hourly Employees weekly, in arrears, so every Friday for the prior week. Debtor pays its Salaried Employees on the 15th and last day of each month. A chart itemizing the estimated gross amounts of Wage Obligations paid but uncleared as of the Petition Date is attached hereto as **Exhibit A**.

3

9. In addition, the Debtor is required to make matching payments from its own funds on account of social security and Medicare taxes, and to pay, based on a percentage of gross payroll (and subject to state-imposed limits), additional amounts to the taxing authorities for, among other things, state and federal unemployment insurance. The total outstanding amount of payroll tax obligations is $21,978.68. Debtor seeks authorization to continue to pay these funds in the ordinary course of business.

10. The Debtor also permits Employees to accrue various paid time off, pursuant to which Employees are eligible, in certain circumstances, to receive their full wages for, among other things, vacation and/or personal days, among other matters (the "Vacation Accruals").

11. The Debtor's Chapter 11 case was filed during the Debtor's normal payroll periods for hourly and salaried Employees. Employees rendered services incurred in anticipation of receiving their standard compensation and reimbursements; however, as of the Petition Date, such obligations are paid current and reimbursed, although some of the Employees' checks had not yet cleared the payroll bank account.

12. If the Debtor is unable to take the necessary steps to ensure that wages and related obligations are paid for the pay period ending immediately prior to the Petition Date, and also for those Employees' wages and related obligations incurred after the Petition Date, there is significant risk that large numbers of essential Employees will resign and that those Employees who remain will be discontented and demoralized.

13. The Debtor intends to file an agreed stipulation for the continued use of cash collateral, and will use such cash to pay its Employees. By this Motion, the Debtor seeks authority to pay and/or honor the obligations described herein to its Employees. The aggregate of Wage Obligations to be paid to or for the benefit of each of the Employees pursuant to this Motion will not exceed $11,725.00 per Employee per the salary cap in Section 507(a)(4) of the Bankruptcy Code.

14. In addition, the Debtor seeks authority to pay certain vendors whose goods and services are critical to the ongoing operations of Debtor, and without such payment on pre-petition claims, such vendors will not continue to supply Debtor. The interruption caused by

termination of the vendors' products or services would cause serious harm to Debtor and its estate.

## V.

## **LEGAL AUTHORITIES**

A.  Wage Obligations

15.  Continued payment of Wage Obligations, Employee Benefit Contributions, and Reimbursable Business Expenses, and maintaining its worker's compensation insurance, are essential for the Debtor to preserve the morale and to maintain positive relations between the Debtor and its Employees, as well as allow it to continue operating.  If the relief requested herein is not granted, the success of the Debtor's reorganization will be placed in substantial jeopardy.  Thus, the relief requested in this Motion is in the best interests of the Debtor's estate, creditors and parties in interest.

16.  Sections 105(a) and 363(b) of the Bankruptcy Code, in conjunction with Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, and the "doctrine of necessity" established by case law, enable this Court to authorize the Debtor to continue payment of Wage Obligations, Employee Benefit Contributions, and Reimbursable Business Expenses.

17.  The immediate payment of prepetition and post-petition wage claims are necessary to retaining the Debtor's skilled employees; therefore, such payments are critical to maintaining the Debtor's ongoing business and its reorganization efforts.  As a result, courts have held that pursuant to Sections 105(a), 363(b), 507(a)(4), and 507(a)(5) of the Bankruptcy Code, pre-petition wage claims may be payable outside of a plan of reorganization by virtue of their necessity, as well as their priority.  See In re CEI Roofing, Inc., 315 B.R. 50, 61 (Bankr. N.D. Tex. 2004); In re CoServ, L.L.C., 273 B.R. 487, 494 n.10 (Bankr. N.D. Tex. 2002); In re The Colad Group, Inc., 324 B.R. 208, 214 (Bankr. W.D.N.Y. 2005); In re Equalnet Comm. Corp., 258 B.R. 368, 370 (Bankr. S.D. Tex. 2000); see also In re Adams Apple, Inc., 829 F.2d 1484, 1490 (9th Cir. 1987) (acknowledging the "doctrine of necessity," and noting that cases have permitted unequal treatment of pre-petition debts when necessary for rehabilitation, including specifically within the context of pre-petition wages); In re Ionosphere Clubs, Inc., 98

B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (approving payment of pre-petition wages to current employees where it was necessary to pay such claims "in order to preserve and protect its business and ultimately reorganize, retain its currently working employees and maintain positive employee morale"); In re Gulf Air, Inc., 112 B.R. 152 (Bankr. W.D. La. 1989) (approving the payment of certain pre-petition wages, health insurance premiums, life insurance premiums, and workers' compensation premiums).

18. With respect to payroll taxes in particular, the payment of such taxes will not prejudice other creditors of the Debtor's estate as the relevant taxing authorities generally would hold priority claims under Section 507(a)(8) of the Bankruptcy Code with respect to such obligations. Moreover, the portion of the payroll taxes withheld from an Employees' wages on behalf of the applicable taxing authority is held in trust by the Debtor. As such, these payroll taxes are not property of the Debtor's estate under Section 541 of the Bankruptcy Code. See Beiger v. IRS, 496 U.S. 53 (1990).

B. Critical Vendor Claims

19. Debtor relies on certain vendors for the provision of raw materials essential to the manufacturing and distribution of its environmental chemicals and for the transportation of those potentially hazardous chemicals to customers, including industries and municipalities. These vendors are essential to Debtor's ability to continue to operate its business. Debtor has incurred certain liabilities to these critical vendors pre-petition, which must be paid as soon as possible to avoid interruption in service. An itemization of the Debtor's critical vendors with pre-petition balances is attached hereto as **Exhibit B** (the "Critical Vendors"). The total amount owed to critical vendors for pre-petition goods and services is estimated at $1,113,164.42, and the Debtor expects to use cash collateral to pay these liabilities.

20. Debtor is authorized pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code to pay or honor prepetition obligations owed to Critical Vendors in the ordinary course of business and to authorize Debtor's banks to honor and pay checks or electronic transfers used by Debtor to pay prepetition obligations to Critical Vendors who have agreed to continue

supplying goods and services to Debtor on terms that are consistent with the historical trade terms between the parties.

21. The Court has the power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). "It is not uncommon for a Bankruptcy Court to allow payment to critical vendors pursuant to" the Court's equitable powers under Section 105(a). In re Tropical Sportswear Int'l Corp., 320 B.R. 15 (Bankr. M.D. Fla. 2005) (citations omitted); *see also* In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (a Bankruptcy Court's use of its equitable powers to "authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept").

22. Numerous Bankruptcy Courts have utilized their equitable powers under section 105(a) or under the "doctrine of necessity" to allow debtors to pay critical prepetition claims not explicitly authorized by the Bankruptcy Code. *See*, Tropical Sportswear, supra, 320 B.R. 15 (authorizing debtors, who were designers and marketers of clothing, to pay critical suppliers of clothing $6.5 million on account of prepetition debts); In re Wehrenberg, Inc., 260 B.R. 468 (Bankr. E.D. Mo. 2001) (allowing debtor to pay prepetition claims of vendors who supplied motion pictures that were critical to debtor's operation of a chain of movie theaters); In re Just for Feet, Inc., 242 B.R. 821, 826 (D. Del. 1999) (allowing debtor to pay prepetition claims of athletic apparel and footwear vendors); In re Gulf Air, Inc., 112 B.R. 152 (Bankr. W.D. La. 1989) (allowing debtor to pay pre-petition claims of employees without regard to priorities of section 507(a)(3); In re Structurelite Plastics Corp., 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988) (holding that priority status of payments to employee benefit plan under section 507(a)(5) (previously section 507(a)(4) justified payment prepetition medical claims); Ionosphere, 98 B.R. 174 (allowing payment of prepetition employee claims); *see also* In re United American, Inc., 327 B.R. 776 (Bankr. E.D. Va. 2005) (recognizing its ability to allow payment of critical vendors' prepetition claims in appropriate circumstances but declining to do so on facts presented).

23. The Seventh Circuit, in the case of <u>In re Kmart Corp.</u>, 359 F.3d 866 (7th Cir. 2004), suggested that courts need not rely solely on their broad equitable powers to authorize critical vendor payments but, instead may rely on statutory authority. Although the Seventh Circuit affirmed the district court's order denying the debtors' request to make such payments, it recognized that paying critical vendors may be appropriate in certain cases:

> The foundation of a critical-vendors order is the belief that vendors not paid for prior deliveries will refuse to make new ones. Without merchandise to sell, a retailer such as Kmart will fold. If paying the critical vendors would enable a successful reorganization and make even the disfavored creditors better off, then all creditors favor payment whether or not they are designated as "critical." 359 F. 3d at 872.

The Seventh Circuit suggested, but did not decide, that a statutory basis for critical vendor payments rests in section 363(b)(1): "satisfaction of a pre-petition debt in order to keep 'critical' supplies flowing is a use of property other than in the ordinary course of administering an estate in bankruptcy under section 363(b)(1)." <u>Id.</u> It cautioned, however, that section 363(b)(1) should be used "to do the least damage possible to priorities established by contract and by other parts of the Bankruptcy Code." <u>Id.</u>

24. The U.S. Supreme Court recently agreed *in dicta* with the purpose of paying critical vendors if the goal was to provide a debtor with the possibility of rehabilitation. In <u>Cryzewski v. Jevic Holding Corp.</u>, 137 S. Ct. 973, 197 L. Ed. 2d 398 (2017), the U.S. Supreme Court stated the following:

> We recognize that *Iridium* is not the only case in which a court has approved interim distributions that violate ordinary priority rules. But in such instances one can generally find significant Code-related objectives that the priority-violating distributions serve. Courts, for example, have approved "first day" wage orders that allow payment of employees' prepetition wages, "critical vendor" orders that allow payment of essential suppliers' prepetition invoices, and "roll-ups" that allow lenders who continue financing the debtor to be paid first on their prepetition claims. In doing so, these courts have usually found that the distributions at issue would "enable a successful reorganization and make even the disfavored creditors better off."

<u>Cryzewski v. Jevic Holding Corp.</u>, 137 S. Ct. at 985 (internal citations omitted).

25. In <u>Tropical Sportswear</u>, the Bankruptcy Court, after citing <u>Kmart</u>, set forth a test for determining whether payments to critical vendors are appropriate. Such pre-petition payments should be authorized only if an evidentiary record establishes that:

(i) the payments are necessary to the reorganization process;

(ii) a sound business justification exists in that the critical vendor(s) refuse to continue to do business with the debtor absent being afforded critical vendor status; and

(iii) the disfavored creditors are at least as well off as they would have been had the critical vendor order not been entered. 320 B.R. at 16

26. The debtors in <u>Tropical Sportswear</u> designed "high-quality casual and dress-casual" which they marketed through "all major apparel retail channels" including department stores, specialty stores, catalogs and the internet. <u>Id.</u> at 18. They proposed to pay approximately $6.5 million (approximately 77.5% of their prepetition claims) to four vendors who provided "unique, quality products and services" (including fabric for the debtors' clothing lines) to the debtors. In exchange, the four vendors agreed to continue to provide new products and services to the debtors. <u>Id.</u> The vendors' continued performance was particularly important in light of the debtors' proposed asset sale to a bidder who required the continuation of debtors' business as a condition to its purchase agreement.

27. Applying its three part test, the Court held that the payments to the critical vendors were appropriate. <u>Id.</u> at 20. Specifically, it held that each of the vendors supplied unique goods to the debtors "the continued uninterrupted supply of which is absolutely necessary to the maximization of the value of Debtors' estates" and that a sound business justification existed for such payments because the vendors refused to conduct further business with the debtors absent receiving the payments. <u>Id.</u> at 18-21. *See also* <u>Just for Feet</u>, 242 B.R. at 826 ("[c]learly, Just For Feet cannot survive unless it has name-brand sneakers and athletic apparel to sell in its stores [and the] Debtors need a continuous supply of inventory from athletic footwear and apparel vendors").

28. In the instant case, Debtor has identified the parties listed as Critical Vendors in **Exhibit B** as vendors that supply Debtor with unique goods or services that are critical to Debtor's continued business operations. As set forth in greater detail in **Exhibit B** many of the Critical Vendors are one of a few, if not the only, suppliers/providers of the raw materials essential to the manufacturing and distribution of environmental chemicals. Further, on information and belief, the destruction wrought by Hurricane Harvey has rendered approximately 40% of the United States' supply of caustic acid, chlorine and bleach offline or inaccessible – three raw materials Debtor heavily relies upon for its business. Ongoing relationships with the Critical Vendors who supply and transport these materials will be essential given the high demand and likelihood that finding replacement goods and services post-petition would be at above-market rates in the event the Critical Vendors choose to cease providing such goods or services because of non-payment.

29. If a Critical Vendor subsequently breaches its agreement to continue supplying goods, Debtor requests authority to reclassify any payments made on account of prepetition claims as payments toward post-petition obligations or seek recovery of the payment under 11 U.S.C. § 549.

30. Nothing contained herein is intended or shall be construed as (i) an admission as to the validity of any claim against the Debtor, (ii) a waiver of the Debtor's or any party in interest's rights to dispute any claim, or (iii) an approval or assumption of any agreement, contract, program, policy or lease under Section 365 of the Bankruptcy Code. Likewise, if this Court grants the relief sought herein, any payment authorized pursuant to the Court's order is not intended and should not be construed as an admission to any claim's validity or a waiver of the Debtor's rights to dispute such claim subsequently.

## V.

## NOTICE

31. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." In view of the urgency of the relief requested herein and the risk to the

Debtor's operations if the Debtor cannot pay its Employees or its Critical Vendors, a 14 day stay of the relief sought herein is impractical. Accordingly, the Debtor requests that this Court waive the stay under Bankruptcy Rule 6004(h) and provide in the order granting the relief sought herein that such order shall be effective immediately.

32.     Bankruptcy Rule 6003(b) provides "except to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after filing of the petition, issue an order granting the following: . . . a motion to use, lease or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before filing of the petition. . . ." As described herein, if the outstanding Employee Obligations are not immediately satisfied, the Debtor will unlikely be unable to escape the immediate and irreparable harm that will follow. In order to ensure the Debtor's chances of successfully reorganizing and maximizing value for the Debtor's creditors, this Court should find that the exception set forth in Bankruptcy Rule 6003 applies here.

33.     Given the emergency nature of the relief requested herein, and the potential disruption to the Debtor's business that will ensue if such relief requested is not granted, the Debtor submits that no further notice need be given prior to the granting of the relief sough herein.

## VII.

## **CONCLUSION**

WHEREFORE, the Debtor respectfully requests that the Court enter an order (a) authorizing but not requiring the Debtor to pay and in its sole discretion (i) Wage Obligations to its Employees; (ii) Garnishments; (iii) to make Employee Benefit Contributions or payments to or for the benefit of its Employees with respect to the Employee Benefit Plans; (iv) to pay all costs incident to Prepetition and Postpetition Compensation and employee benefit contributions such as payroll-related taxes and processing costs; (v) to reimburse Employees for Reimbursable Business Expenses, all in accordance with the stated policies with respect thereto; (vi) to settle and to pay workers' compensation claims, and maintain deposits, surety bonds and excess insurance; and (vi) pay Critical Vendor claims; and (b) authorizing all applicable banks

11

and other financial institutions to receive, process, honor and pay any and all checks related to the foregoing, including specifically those drawn from the Accounts, whether presented prior to or after the Petition Date in accordance with the stated policies with regard thereto, provided sufficient funds exist in Debtor's bank accounts to cover such payments. The Debtor also requests such other and further relief as is just and proper.

DATED this 30th day of August, 2017

*/s/ Barbara L. Yong*
_____
Barbara L. Yong, Esq.


STEPHEN R. HARRIS
HARRIS LAW PRACTICE LLC
6151 Lakeside Drive, Suite 2100
Reno, NV 89511

BARBARA L. YONG, ESQ.
ROBERT R. BENJAMIN, ESQ.
CAREN A. LEDERER, ESQ.
BEVERLY A. BERNEMAN, ESQ.
ANTHONY J. D'AGOSTINO, ESQ.
GOLAN CHRISTIE TAGLIA LLP
70 West Madison Street, Suite 1500
Chicago, IL 60602

Proposed Attorneys for Debtor

# "EXHIBIT A"

**Sierra Chemical Co.**

8/31/2017

| Employee | Location | Gross Pay Pay Date 8/31/2017 8/16-8/31/17 (actual) | 8/21-8/27/17 (actual) | Total O/S Payroll |
|---|---|---|---|---|
| Peterson, Scott | NV | $ 2,808.41 | | $ 2,808.41 |
| Suever, Anthony | NV | $ 4,965.25 | | $ 4,965.25 |
| Huizar, Jose | CA | $ 3,610.10 | | $ 3,610.10 |
| Espalin, Ron | NV | $ 6,021.31 | | $ 6,021.31 |
| Eykelbosh, Gerald | NV | $ 3,740.27 | | $ 3,740.27 |
| Fernandez, Louis | CA | $ 3,216.85 | | $ 3,216.85 |
| Flores, Gabriel | CA | $ 3,579.16 | | $ 3,579.16 |
| Karsok, Brian | NV | $ 2,807.13 | | $ 2,807.13 |
| Love, Karen | CA | $ 3,502.08 | | $ 3,502.08 |
| Magdaleno, Brian | CA | $ 2,257.91 | | $ 2,257.91 |
| William, Charles | CA | | $      - | $      - |
| Gardner, Kimberlee | NV | | $   687.16 | $   687.16 |
| Reynon, Alex | CA | | $ 1,971.69 | $ 1,971.69 |
| Freeman, Robert | NV | | $ 1,538.98 | $ 1,538.98 |
| Hallock, Tracy | NV | | $ 1,303.88 | $ 1,303.88 |
| Lankford, Justin | CA | | $ 3,731.63 | $ 3,731.63 |
| Mattingly, Bret | NV | | $   877.45 | $   877.45 |
| Owens, Monte | NV | | $   619.76 | $   619.76 |
| Ferguson, Jett | NV | | $ 1,130.32 | $ 1,130.32 |
| Ponce, Abel | NV | | $   972.55 | $   972.55 |
| Santa Cruz, Adrian | NV | | $   908.17 | $   908.17 |
| Romero, Ignacia | NV | | $ 1,068.29 | $ 1,068.29 |
| Torres-Becerra, Julio | NV | | $   900.20 | $   900.20 |
| Barrientos, Manuel | CA | | $   817.35 | $   817.35 |
| Channoi, Thongwan | CA | | $   922.91 | $   922.91 |
| Contreras, Sergio | CA | | $ 1,033.88 | $ 1,033.88 |
| Disney, James | CA | | $   758.53 | $   758.53 |
| Duarte, Javier | CA | | $   788.29 | $   788.29 |
| Martinez, Aram | CA | | $   364.80 | $   364.80 |
| Montalvo, Cesar | CA | | $   285.00 | $   285.00 |
| Tansaeng, Haet | CA | | $   802.20 | $   802.20 |
| Vera, Ramon | CA | | $   585.32 | $   585.32 |
| Zamorano, Jose | CA | | $   847.12 | $   847.12 |
| De Jesus, Johnny | CA | | $   771.32 | $   771.32 |
| Flores, Paul | CA | | $   996.68 | $   996.68 |
| Sonneberger, Denise | CA | | $ 1,090.42 | $ 1,090.42 |

| Wannavong, AE | CA | | $ 833.63 | $ 833.63 |
|---|---|---|---|---|
| Conley-Rawson, Kay | NV | | $ 696.64 | $ 696.64 |
| Fairbanks, Mary | NV | | $ 816.89 | $ 816.89 |
| Fretter, Natalie | NV | | $ 717.06 | $ 717.06 |
| Watson, Stephanie | NV | | $ 786.21 | $ 786.21 |
| Vanderver, Catheryn | NV | | $ 1,152.86 | $ 1,152.86 |
| Aleman, Jesus | CA | | $ 1,334.61 | $ 1,334.61 |
| Contreras, Erik | CA | | $ 1,055.20 | $ 1,055.20 |
| Haddad III, Alex | CA | | $ 762.64 | $ 762.64 |
| Lopez Ruvalcaba, Armando | CA | | $ 1,301.01 | $ 1,301.01 |
| Nofuente Jr, Zosimo | CA | | $ 1,012.08 | $ 1,012.08 |
| Tubon, Gerry | CA | | $ 1,170.10 | $ 1,170.10 |
| | | $36,508.47 | $37,412.83 | $ 73,921.30 |

| Tax Liability | | $11,223.29 | $10,755.39 | $ 21,978.68 |
|---|---|---|---|---|
| Garnishment | | | $ 128.07 | $ 128.07 |
| Net Pay | | $24,880.93 | $27,339.96 | $ 52,220.89 |

# "EXHIBIT B"

| Sierra Critical Vendor List | | | |
|---|---|---|---|
| Vendor | Prepetition Balance Due | Goods/Services Provided | Explanation of Critical Nature |
| Axiall LLC | $88,451.13 | Chlorine | 1 of 3 manufacturers/suppliers of Chlorine west of the Rocky Mountains (Debtor buys from 2 of 3 suppliers due to volume needed); continuity of supply would be jeopardized if this vendor is not paid and Debtor would be unlikely to secure replacement goods in the volume necessary; vendor requires strict adherence to payment terms and conditions. |
| Brenntag Pacific, IN | $56,264.96 | Caustic | 1 of 4 manufacturers/suppliers of caustic soda west of the Rocky Mountains ; goods are imported from Asia so quality and "fit-for-purpose" concerns would arise with a replacement vendor; replacement goods at market would likely require a premium cost. |
| Chemical Transfer | $25,143.79 | Freight | One of few outside freight companies nearby and willing to transport hazardous materials; Debtor uses this vendor daily and likelihood of finding a nearby, reliable transportation company willing to carry hazardous materials will be difficult and certainly interrupt regular business; pricing with this vendor is based on long term relationship that Debtor is unlikely to beat on open market. |
| Chemtrade Chemicals | $155,341.05 | Chlorine | 1 of 3 manufacturers/suppliers of Chlorine west of the Rocky Mountains (they account for 85% of Debtor's volume); Chlorine market is very tight, so if this vendor is afforded the opportunity to sell to someone else by virtue of nonpayment, they would likely take the opportunity to sell at higher rates to others; Debtor would be unable to find replacement volume from another source to continue operations. |
| Connel Bros Company | $127,066.50 | Various Imported Products - primarily Caustic Soda Beads | Vendor provides imported products, such as caustic soda beads, that if Debtor were forced to find replacement goods, there would be significant quality risks, "fit for purpose" concerns and service issues with replacement vendors. |
| Kemira Water solutions | $11,637.64 | Perric Chloride | 1 of 2, if not the only, manufacturer/supplier of Perric Chloride west of the Rocky Mountains; non-payment would present signfiicant risk of inability to find replacement goods. |
| Kennecott Utah Copper | $24,065.12 | Sulfric Acid | Very large supplier of Sulfric Acid; Debtor believes it might be able to find replacement goods, but it would require sourcing the goods at a much higher price that woudl cause problems for operation. |
| P V S Chemical Solutions | $77,819.50 | Sulfur Dioxide | 1 of 3 manufacturers/suppliers of Sulfur Dioxide west of the Rocky Mountains; there is a signficant risk that finding replacement goods would not be possible without this vendor or it woudl come at a signficant cost. |

Stephen R. Harris, Esq., Harris Law Practice LLC, 6151 Lakeside Drive, Suite 2100, Reno, NV 89511, 775-786-7600
Barbara L. Yong, Esq., Robert R. Benjamin, Esq., Caren A. Lederer, Esq., Beverly A. Berneman, Esq., Anthony J. D'Agostino, Esq., Golan Christie Taglia LLP, 70 W. Madison Street, Suite 1500, Chicago, IL 60602, 312-263-2300

| | | | |
|---|---|---|---|
| Reagent Chemical | $18,944.72 | HCl | 1 of 2 (maybe 3) manufacturers/suppliers of HCl west of the Rocky Mountains; there is a signficant risk that finding replacement goods would not be possible without this vendor or it woudl come at a signficant cost. |
| Univar USA Inc. | $528,430.01 | Caustic, Bleach, HCL | Largest provider and primary source for bleach (most important material, apart from Chlorine); the only other major source for bleach in the volume necessary is Debtor's largest competitor; also, Debtor's largest supplier of caustic (with Brenntag); ability to replace this vendor's goods at market would likely be unfeasible due to lack of available volume and cost. |
| **Total:** | **$1,113,164.42** | | |