BARBARA L. YONG, ESQ. **(**Illinois Bar No. 6184000)
ROBERT R. BENJAMIN, ESQ. (Illinois Bar No. 0170429)
CAREN A. LEDERER, ESQ. (Illinois Bar No. 6244631)
BEVERLY A. BERNEMAN, ESQ. (Illinois Bar No. 6189418)
ANTHONY J. D'AGOSTINO, ESQ. (Illinois Bar No. 6299589)
GOLAN CHRISTIE TAGLIA LLP
70 West Madison Street, Suite 1500
Chicago, IL 60602
Telephone: (312) 263-2300
E-Mail: blyong@gct.law; rrbenjamin@gct.law; calederer@gct.law; baberneman@gct.law; ajdagostino@gct.law

STEPHEN R. HARRIS, ESQ. (Nevada Bar No. 001463)
HARRIS LAW PRACTICE LLC
6151 Lakeside Drive, Suite 2100
Reno, NV 89511
Telephone: (775) 786-7600
E-Mail: steve@harrislawreno.com

Proposed Attorneys for Debtor

Proposed Local Attorney for Debtor

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF NEVADA

* * * * *

IN RE:

SIERRA CHEMICAL CO., a Nevada domestic corporation,

Debtor.

Case No. 17-51019-btb

(Chapter 11)

**INTERIM STIPULATION OF ADEQUATE PROTECTION AND USE OF BANK OF AMERICA'S CASH COLLATERAL**
**(11 U.S.C. § 363 (c)(2))**

Hearing Date:  OST Pending
Hearing Time:  OST Pending
Est. Time:      15 minutes
Set by:        Judge Beesley

SIERRA CHEMICAL CO., a Nevada domestic corporation ( "Debtor"), by and through its proposed attorneys BARBARA L. YONG, ESQ., ROBERT R. BENJAMIN, ESQ., CAREN A. LEDERER, ESQ., BEVERLY A. BERNEMAN, ESQ., and ANTHONY J.

1

D'AGOSTINO, ESQ., of GOLAN CHRISTIE TAGLIA LLP and STEPHEN R. HARRIS, ESQ. of HARRIS LAW PRACTICE LLC and Bank of America, N.A. ("Bank of America"), Secured Creditor in the above-captioned Chapter 11 case, by and through their attorneys GREGORY GARTLAND and DANIEL MCGUIRE of WINSTON & STRAWN LLP hereby stipulate and agree as follows:

## RECITALS

A.   Petition Date.  On August 30, 2017 (the "Petition Date"), the Debtor commenced the above-captioned Chapter 11 bankruptcy case by filing a voluntary petition with the United States Bankruptcy Court for the District of Nevada.  No trustee has been appointed and the Debtor is operating and managing business of manufacturing and distributing chemicals from its production base in Sparks, Nevada, and Stockton, California, as a debtor-in-possession, pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

B.   Jurisdiction.   This Court has jurisdiction over this Chapter 11 case, and the Parties and property affected hereby, pursuant to 28 U.S.C. §§ 157(b) and 1334.   This proceeding constitutes a core proceeding as defined in 28 U.S.C. §157(b)(2).   Venue of this bankruptcy case is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.   Debtor.      Debtor is in the business of manufacturing and distributing environmental chemicals for municipal, industrial and mining markets, supplying water treatment plants, agricultural facilities and food processors with essential chemicals from its production bases in Sparks, Nevada and Stockton, California.

D.   The Bank of America Secured Claim.

1.   Debtor, together with its owner Carus Holdings Nevada, LLC, and related entities, as borrowers, are parties under that certain Second Amended and Restated Loan

Barbara L. Yong, Esq., Robert R. Benjamin, Esq., Caren A. Lederer, Esq., Beverly A. Berneman, Esq., Anthony J. D'Agostino, Esq., Golan Christie Taglia LLP, 70 W. Madison Street, Suite 1500, Chicago, IL 60602, 312-263-2300

Stephen R. Harris, Esq., Harris Law Practice LLC, 6151 Lakeside Drive, Suite 2100, Reno, NV 89511, 775-786-7600

Agreement dated May 4, 2017 (as amended, the "Bank of America Prepetition Loan Agreement" and, collectively with the related security agreements, mortgages, related mortgaged property support documents, qualifying control agreement, each landlord waiver, joinder agreement, each of the mortgages, collateral assignments, security agreements, pledge agreements or other similar agreements, instruments or documents that creates or purports to create a Lien in favor of the Administrative Agent for the benefit of the Secured Parties (as defined in the Bank of America Prepetition Loan Agreement), the "Prepetition Loan Documents")[1] with Bank of America, as Administrative Agent (in that capacity, the "Agent"), Swingline Lender, and Letter of Credit Issuer.  "Secured Parties" has the meaning ascribed to such term in the Bank of America Prepetition Loan Agreement.  Under the Bank of America Prepetition Loan Documents, the Debtor granted to the Agent, for the benefit of the Secured Parties, first-priority, perfected liens upon all of the Debtor's assets (collectively, the "Bank of America Collateral").  A copy of the Bank of America Prepetition Loan Agreement is attached hereto as **Exhibit A.**

2.    As of the Petition Date, the Debtor was indebted to Agent and the Secured Parties, without claim, defense, counterclaim, recoupment, or offset of any kind in the approximate principal amount (inclusive of letter of credit exposure) of $15,985,927.20 on the Revolver Note, and $8,000,000.00 on the Term Loan (the "Prepetition Debt") in respect to loans Secured Parties made to the Debtor pursuant to, and in accordance with, the Bank of America Prepetition Loan Agreement, plus (i) any accrued and unpaid interest therein, (ii) all costs, fees, expenses, and charges payable under the Bank of America Prepetition Loan Agreement (including, without limitation, reasonable fees and expenses of Agent's attorneys), (iii) any

---

[1] Debtor's co-Borrowers are Carus Group, Inc., Carus Holdings Nevada, LLC,  Carus Corporation, Alexander Chemical Corporation, Carus Chemical Company, Circle Transport, Inc., and Carus EFTB, Inc.

Barbara L. Yong, Esq., Robert R. Benjamin, Esq., Caren A. Lederer, Esq., Beverly A. Berneman, Esq., Anthony J. D'Agostino, Esq., Golan Christie Taglia LLP, 70 W. Madison Street,
Suite 1500, Chicago, IL 60602, 312-263-2300
Stephen R. Harris, Esq., Harris Law Practice LLC, 6151 Lakeside Drive, Suite 2100, Reno, NV 89511, 775-786-7600

Stephen R. Harris, Esq., Harris Law Practice LLC, 6151 Lakeside Drive, Suite 2100, Reno, NV 89511, 775-786-7600
Barbara L. Yong, Esq., Robert R. Benjamin, Esq., Caren A. Lederer, Esq., Beverly A. Berneman, Esq., Anthony J. D'Agostino, Esq., Golan Christie Taglia LLP, 70 W. Madison Street,
Suite 1500, Chicago, IL 60602, 312-263-2300

other loans, advances, and other financial accommodations made pursuant to the Bank of America Prepetition Loan Agreement, and (iv) all other payment obligations of the Debtor arising under or in relation to any and all of the Bank of America Prepetition Loan Agreement (all such obligations collectively, and in each case either now existing or hereafter arising, due or to become due, direct or indirect, absolute or contingent, and howsoever evidenced, held, or acquired the "Bank of America Prepetition Obligations").

E. No Need for Adequate Protection Payments.

Secured Parties are fully secured by the perfected security interest they hold in the assets of Sierra, its parent, and other related entities.  As a result of good faith negotiations in an attempt to resolve their issues and to provide Secured Parties with adequate protection for their respective collateral, the Parties have agreed to an order allowing the Debtor's use of Agent's cash collateral from and after the Petition Date, as provided herein.

## STIPULATIONS

Based upon the foregoing Recitals, and good cause appearing therefore,

IT IS HEREBY STIPULATED, CONSENTED TO AND AGREED by and among the Debtor and Bank of America, as follows:

1.    Incorporation.    The Recitals contained hereinabove are material provisions of this Stipulation and are incorporated herein in their entirety by this reference.

2.    Indebtedness.

(a)    The Debtors acknowledge that pursuant to the Bank of America Prepetition Loan Agreement and as of the date hereof, the Debtor is truly and justly indebted and liable to the Agent and the Secured Parties, without defense, counterclaim, or offset of any kind, in the aggregate principal amount of (inclusive of letter of credit exposure) approximately

Stephen R. Harris, Esq., Harris Law Practice LLC, 6151 Lakeside Drive, Suite 2100, Reno, NV 89511, 775-786-7600

Barbara L. Yong, Esq., Robert R. Benjamin, Esq., Caren A. Lederer, Esq., Beverly A. Berneman, Esq., Anthony J. D'Agostino, Esq., Golan Christie Taglia LLP, 70 W. Madison Street, Suite 1500, Chicago, IL 60602, 312-263-2300

1  $15,985,927.20 on the Revolver Note, and $8,000,000.00 on the Term Loan plus (i) any

2  accrued and unpaid interest therein, (ii) all costs, fees, expenses, and charges payable under the

3  Bank of America Prepetition Loan Agreement (collectively, the "Secured Obligations").    The

4  Prepetition Debt is not subject to subordination or recharacterization for any reason.

5  Additionally, the liens and security interests granted to Agent pursuant to the Bank of America

6  Prepetition Loan Documents, are valid, duly authorized, perfected, enforceable, non-voidable,

7  first-priority liens and security interests in the Debtor's assets as of the Petition Date (the

8  "Prepetition Collateral").

9

10          (b)     The Prepetition Obligations constitute legal, valid, and binding

11  obligations of the Debtor, enforceable in accordance with their terms (other than in respect of

12  the stay of enforcement arising from § 362 of the Bankruptcy Code) and fully enforceable

13  without claim, defense, counterclaim, recoupment, or offset of any kind.    For avoidance of

14  doubt, no portion of the Secured Obligations are subject to avoidance, recharacterization, setoff,

15  recoupment, or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy

16  law;

17

18

19          (c)     The Debtor does not have, and hereby forever waives, releases, and

20  affirmatively agrees not to allege or otherwise pursue, any defenses, affirmative defenses,

21  counterclaims, claims, causes of action, recoupments, setoffs, or other rights that it has or may

22  have arising under the Bankruptcy Code, applicable nonbankruptcy law, or otherwise against

23  each of the Secured Parties, or any of their affiliates, predecessors, successors, assigns, agents,

24  officers, directors, members, employees, attorneys, insurers and advisors, (i) to contest any

25  "Defaults" or "Events of Default" under the Pre-Petition Loan Documents which were or could

26  have been declared by a Secured Party as of the Petition Date; (ii) to contest any provisions of

27

28

Barbara L. Yong, Esq., Robert R. Benjamin, Esq., Caren A. Lederer, Esq., Beverly A. Berneman, Esq., Anthony J. D'Agostino, Esq., Golan Christie Taglia LLP, 70 W. Madison Street, Suite 1500, Chicago, IL 60602, 312-263-2300
Stephen R. Harris, Esq., Harris Law Practice LLC, 6151 Lakeside Drive, Suite 2100, Reno, NV 89511, 775-786-7600

the Pre-Petition Loan Documents; (iii) to contest the principal amount of the Debtor's indebtedness to the Secured Parties as of the Petition Date; (iv) to contest the conduct of the Secured Parties in connection with any provisions of the Pre-Petition Loan Documents and this Stipulation or the above-captioned case including, without limitation, negotiating and obtaining court approval of this Stipulation and proceedings in connection with the interpretation, amendment, modification, enforcement or carrying out of the Pre-Petition Loan Documents and this Stipulation; (v) against any Secured Party with respect to any lender liability theories or actions pursuant to § 510 of the Bankruptcy Code or avoidance actions pursuant to §§ 544, 547, 548, 549, 550, 552, and 553 of the Bankruptcy Code; and (vi) to challenge that the security interests and liens granted to any Secured Party under the Pre-Petition Loan Documents or pursuant to this Stipulation and any order approving this Stipulation are senior, valid, fully perfected, non-voidable, enforceable, first priority security interests and liens;

(d)     The liens and security interests granted to Agent pursuant to and in connection with the Pre-Petition Loan Documents were on the Petition Date, and are (i) valid, binding, perfected, enforceable, first priority security interests in and liens on, without limitation, the Pre-Petition Collateral, including cash proceeds thereof, and Cash Collateral (defined below); (ii) not subject to avoidance, recharacterization, setoff, recoupment or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law, and (iii) subject and subordinate only to valid, perfected, and unavoidable liens permitted under the Pre-Petition Loan Documents, if any, to the extent such liens are senior to the pre-petition liens and security interests granted Agent under the BANK OF Pre-Petition Loan Documents.

3.     The Cash Collateral. Agent's security interests and liens have attached to all funds, personal property, and real property including the product, issues, rents, profits and

Stephen R. Harris, Esq, Harris Law Practice LLC, 6151 Lakeside Drive, Suite 2100, Reno, NV 89511, 775-786-7600
Barbara L. Yong, Esq., Robert R. Benjamin, Esq., Caren A. Lederer, Esq., Beverly A. Berneman, Esq., Anthony J. D'Agostino, Esq., Golan Christie Taglia LLP, 70 W. Madison Street,
Suite 1500, Chicago, IL 60602, 312-263-2300

other proceeds of the Prepetition Collateral and Agent has asserted will, notwithstanding the commencement of the Chapter 11 Cases, as of the Petition Date and thereafter attach to product, issues, rents, profits and other proceeds of the Prepetition Collateral, including, without limitation, those consisting of (i) all of the Debtor's accounts receivable and inventory, and all cash proceeds (including cash insurance proceeds thereof), products, accessions, rents and profits of or in respect of any and all of the foregoing, and (ii) all deposit accounts and securities accounts into which the cash proceeds of the accounts receivable and inventory are deposited, in each case whether owned or in existence as of the Petition Date or thereafter acquired or arising (collectively, the "Cash Collateral"). All of the Debtor's cash, including the cash and other items located in accounts constituting a portion of the Prepetition Collateral, wherever located, whether as original collateral or cash proceeds of the Prepetition Collateral also constitute and are included within the definition of the term "Cash Collateral".

4.    Use of Cash Collateral. Subject to the terms and conditions set forth in this Stipulation, the Debtor is, through and including the earlier to occur of (a) September 30, 2017, (b) entry of an order allowing the use of Cash Collateral on a final basis (a "Final Order"), or (c) termination of this Interim Order following issuance of a Remedies Notice as set forth in Section 11 below, authorized to use Cash Collateral solely to pay ongoing operating expenses, as set forth in the monthly averaged budget attached hereto as **Exhibit B** (the "Cash Collateral Budget"). Actual monthly expenses may exceed those set forth in the Cash Collateral Budget by more than 10% in any given month, however, the cumulative expenses shall not exceed 10% without prior written consent of Agent; provided, that notwithstanding anything to the contrary herein, no more than the aggregate of $10,000 of the Prepetition Collateral, including Cash Collateral, may be used by any Committee, but subject to any limitations of the Cash Collateral

Budget, to investigate the validity, enforceability, or priority of the Debtor's obligations under the Pre-Petition Loan Documents or Agent's security interests in and liens on its Pre-/Post-Petition Collateral and Cash Collateral, or to investigate any potential claims or defenses against Agent.

5.      Adequate Protection.  As adequate protection of the interests of Agent and Secured Parties, in compliance with §506(b) of the Bankruptcy Code, and in consideration of consent to the Debtor's continued use of Collateral as set forth in this Stipulation, Agent is hereby granted an additional and replacement lien (the "Post-Petition Lien") on each and all of the Debtor's post-petition assets as Agent had in the Prepetition Collateral under the Pre-Petition Loan Documents on the Petition Date (collectively, the "Post-Petition Collateral"), and any and all proceeds of such Post-Petition Collateral, with such Post-Petition Lien being a perfected security interest in and lien on the Post-Petition Collateral having the same extent, validity, and priority as Agent have in the Prepetition Collateral on the Petition Date. Notwithstanding any provisions of any agreement, instrument, document, the Uniform Commercial Code, or any other relevant law or regulation of any jurisdiction, the security interests and liens granted Agent pursuant to this Stipulation, and recognized herein, shall be deemed fully and effectively granted and automatically-perfected immediately upon entry of an order by the Bankruptcy Court approving this Stipulation and Agent need not provide any further notice and need not take any further steps under any applicable federal, state, or local law, rule or regulation to create or perfect such security interests or liens  Further, the automatic stay provisions of § 362(a) of the Bankruptcy Code are hereby vacated and modified to permit (i) Agent to undertake and perform all acts and take all actions necessary to implement this Stipulation and (ii) the Debtor to create, and Agent to perfect, any and all security interests,

Stephen R. Harris, Esq., Harris Law Practice LLC, 6151 Lakeside Drive, Suite 2100, Reno, NV 89511, 775-786-7600
Barbara L. Yong, Esq., Robert R. Benjamin, Esq., Caren A. Lederer, Esq., Beverly A. Berneman, Esq., Anthony J. D'Agostino, Esq., Golan Christie Taglia LLP, 70 W. Madison Street,
Suite 1500, Chicago, IL 60602, 312-263-2300

liens, and mortgages granted herein; provided, however, that Agent shall not be required to file or record Uniform Commercial Code financing statements, mortgages, notices of lien, or other instruments with any filing authority to perfect any lien, mortgage, or security interest granted by this Stipulation or take any other action to perfect such liens, mortgages, and security interests.  If, however, Agent shall, in its sole discretion, elect for any reason to file, record or serve any such financing statements or other documents with respect to such security interests and liens, the Debtor shall execute the same upon request and the filing, recording or service thereof (as the case may be) shall be deemed to have been made at the time on the Petition Date. A certified copy of this Stipulation and any order approving the same may, in the discretion of Agent, be filed with or recorded in the filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby authorized to accept such certified copies of this Stipulation and order for filing and recording without the imposition of any stamp, intangibles, recording or similar tax in accordance with the provisions of § 1146 of the Bankruptcy Code.

Agent and the Secured Parties are additionally entitled, pursuant to Bankruptcy Code sections 361 and 363(e), to adequate protection of their interest in the Prepetition Collateral, including the Cash Collateral, for any diminution in value of Secured Parties' interests in the Prepetition Collateral, including, without limitation, any such diminution resulting from the use by the Debtor of Cash Collateral and any other Prepetition Collateral and the imposition of the automatic stay pursuant to Bankruptcy Code section 362.

(a)     Liens. As adequate protection for any diminution in value of the Agent's interests in the Prepetition Collateral from and after the Petition Date, effective upon the date of this Stipulation and without the necessity of the execution by the Debtor of any

Stephen R. Harris, Esq., Harris Law Practice LLC, 6151 Lakeside Drive, Suite 2100, Reno, NV 89511, 775-786-7600
Barbara L. Yong, Esq., Robert R. Benjamin, Esq., Caren A. Lederer, Esq., Beverly A. Berneman, Esq., Anthony J. D'Agostino, Esq., Golan Christie Taglia LLP, 70 W. Madison Street,
Suite 1500, Chicago, IL 60602, 312-263-2300

mortgages, security agreements, pledge agreements, financing statements or otherwise, and the following replacement security interests and liens are hereby granted to Bank of America:

(1)    a perfected first-priority senior security interest in and lien upon all Cash Collateral, whether existing on the Petition Date or thereafter acquired, including the proceeds thereof;

(2)    a perfected first-priority senior security interest in and lien upon the Prepetition Collateral in existence on the Petition Date and, to the extent of any diminution in value, thereafter acquired; and

(3)    a perfected security interest in and lien upon all property of the Debtor other than the Cash Collateral or the Prepetition Collateral, whether existing on the Petition Date or thereafter acquired.

(b)    <u>Section 507(b) Claim</u>. Bank of America is hereby granted a superpriority claim in the Debtor's Chapter 11 Cases as provided for in Bankruptcy Code section 503(b) and/or 507(b) with priority over any and all other administrative expenses in the Debtors' Chapter 11 Case of any kind payable or allowed pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 365, 503(a) 503(b), 507(a), 507(b), 546, 726(d), 1113 and/or 1114.

(c)    <u>No Need for Adequate Protection Payments</u>.  Bank of America is fully secured by the perfected security interest it holds in the assets of Sierra, its parent, and other related entities.  As a result of good faith negotiations in an attempt to resolve their issues and to provide Bank of America with adequate protection for their respective collateral, the Parties have agreed to an order allowing the Debtor's use of Bank of America's cash collateral

10

from and after the Petition Date, as provided herein, without the requirement of adequate protection payments.

        (d)    <u>Additional Adequate Protection</u>. As additional adequate protection for Bank of America: (i) Debtor shall continue to prepare and deliver to the Agent all documents and reports required to be prepared and delivered to the Agent under Bank of America Prepetition Loan Agreement; (ii) the Debtor shall maintain with respect to the Prepetition Collateral and the Cash Collateral insurance of the type and in the amount as the Debtor maintained as of the Petition Date, and as required under the Bank of America Prepetition Credit Documents and (iii) commencing 30 days after the Petition Date, weekly delivery of an updated 13 week cash flow budget and variance report, to be set forth in greater detail in the Final Order or further stipulation between the Parties.

        6.    <u>Perfection of Adequate Protection Liens</u>. Neither the Agent nor any Secured Party shall be required to file or record financing statements, mortgages, notices of lien, or similar instruments in any jurisdiction or take any other action in order to validate and perfect the security interests and liens granted to them pursuant to this Stipulation. If the Agent shall, in its sole discretion, choose to file such financing statements, mortgages, notices of lien or similar instruments or otherwise confirm perfection of such security interests and liens, the liens and security interests granted herein shall be deemed perfected at the time and on the date of entry of this Interim Order. Upon request by the Agent, the Debtor is authorized, without the further consent of any party, to take any actions and to execute and deliver such instruments (in each case without representation or warranty of any kind) as may be necessary to enable the Agent to further perfect, preserve and enforce the security interests and liens granted to the Agent by this Interim Order.

7.    <u>Limitation on Charging Expenses Against Collateral</u>. From and after entry of any consensual final order with respect to the use of Cash Collateral, no expenses of administration of these Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral or the Cash Collateral, pursuant to Bankruptcy Code section 506(c) or any similar principal of law, without the Agent's prior written consent, and no such consent will be implied from any action, inaction, or acquiescence by the Agent or the Secured Parties.

8.    <u>Limitations on Use of Cash Collateral</u>. Notwithstanding anything herein to the contrary, no Cash Collateral may be used to (i) object, contest or raise any defense to, the validity, authorization perfection, priority, extent, or enforceability of the Prepetition Debt, the liens securing the Bank of America Prepetition Debt, or the liens granted to the Agent and the Secured Parties by this Stipulation, (ii) assert any claims or causes of action against the Agent or the Secured Parties, or (iii) as long as the Debtor is authorized or able to continue to use Cash Collateral pursuant to the terms of this Stipulation, attempt to obtain, without the consent of the Agent, or over the objection of the Agent, the Court's authorization to use Cash Collateral under terms other than those provided herein or the Court's authorization to grant any priming, senior or *pari passu* security interest in or lien on the Prepetition Collateral or the Cash Collateral.

9.    <u>Sale Process</u>.   The Debtor, as a continuing condition of their use of the Cash Collateral, shall seek to sell substantially all of their assets in the Debtors' Cases pursuant to section 363 of the Bankruptcy Code (the "Sale Process").  On a weekly basis (unless another time is mutually agreed to) upon request of the Agent, the Debtors shall update the Agent on the status of the Sale Process, which update shall include information on the steps the Debtors have

taken toward consummating a sale and any other related information reasonably requested by the Agent.

10.   <u>Sale Milestones</u>.  The Debtors shall, as a continuing condition to their use of the Cash Collateral, (i) on or before the September 20, 2017, following the Petition Date, file a sale and bid procedures motion, in form and substance satisfactory to Agent in its sole discretion; (ii) on or before October 20, 2017 obtain entry from the Bankruptcy Court of an order (the "Bid Procedures Order") approving bid procedures in form and substance satisfactory to the Agent in its sole discretion, which order shall authorize the solicitation of bids for the sale of the Debtor's assets and which shall set a deadline (the "Bid Deadline") to receive bids related to such sale of no later than November 10, 2017; (iii) on or before November 17, 2017, conduct an auction, if necessary; (iv) on or before November 22, 2017, obtain entry of an order of the Bankruptcy Court approving the sale in form and substance satisfactory to the Agent in its sole discretion (the "Sale Order"); and (v) on or before November 30, 2017 close the sale.  After the closing of the sale, the Debtors shall reserve $50,000.00 of Cash Collateral to wind down the Debtor's estates (the "Wind-Down Amount").  All Cash Collateral in the Debtors' possession on the first Business Day following the closing of the sale, other than the Wind-Down Amount, shall be immediately remitted to the Agent.  Thereafter, all Cash Collateral received by the Debtors, other than the Wind-Down Amount, shall be remitted to the Agent within one Business Day of receipt.

11.   <u>Automatic Stay</u>. The automatic stay extant under Bankruptcy Code section 362(a) shall be, and it hereby is, modified to the extent necessary to permit the Secured Parties and Agent to send the Remedies Notice (defined below) and exercise any rights and remedies hereunder as set forth herein.

12. <u>Reservation of Rights of Secured Parties</u>. The Agent and the Secured Parties reserve the right to request further or different adequate protection in the future, and the Debtor or any other party may contest any such request. Any such request shall be heard by the Court on three (3) business days' notice or as soon thereafter as the Court's schedule permits. In addition, the Agent and the Secured Parties reserve all rights and defenses, including, without limitation, with respect to any final order or final relief pertaining to the Cash Collateral and/or the Prepetition Collateral.

13. <u>Events of Default</u>. Each of the following shall constitute an "Event of Default" hereunder: (i) use of Cash Collateral other than as set forth herein; (ii) the Debtor or any other party applies to the Court for an order authorizing the use of Cash Collateral or that seeks approval of a priming, senior or pari passu security interest in or lien upon Cash Collateral or the Prepetition Collateral; (iii) the filing by the Debtor or any other party of any pleading seeking to challenge the Agent's lien upon Cash Collateral or the Prepetition Collateral or otherwise asserting rights, claims or causes of action against the Agent and/or the Secured Parties with respect to the Prepetition Debt; (iv) the breach by the Debtor of their obligations under this Stipulation (including the failure to meet any sale milestone); (v) any stay, reversal, vacatur or rescission of this Stipulation; (vi) the dismissal of, conversion of or appointment of an examiner with expanded powers in the Debtors' Chapter 11 Case; (vii) the failure of sale of a controlling interest in the Debtor; (viii) a material adverse change shall occur in the condition or prospects, financial or otherwise, of the Debtor, taken as a whole, after the Petition Date, other than the filing of the petition itself or the agreement to and execution of this Stipulation; (ix) an order shall be entered reversing, amending, supplementing, staying for a period in excess of three (3) business days, vacating or otherwise modifying this Stipulation without the consent of

14

the Agent; (x) failure of the Debtor to obtain the entry by the Court of an order, acceptable in form and substance to Agent, approving a Disclosure Statement on or before December 15, 2017; and (xii) failure of the Debtor to obtain the entry by the Court of an order, acceptable in form and substance to Agent, confirming a Plan by February 15, 2018.

14.    <u>Remedies Notice</u>. Immediately upon the occurrence or existence of an Event of Default, the Agent shall be authorized to issue a notice (a "<u>Remedies Notice</u>") (which Remedies Notice may be delivered by electronic mail) thereof to the Debtors, their counsel, counsel to any Committee and the U.S. Trustee. The Debtor's right to use Cash Collateral shall terminate immediately upon the receipt of a Remedies Notice.

15.    <u>Parties in Interest Bound</u>.

(a)    The admissions contained in this Stipulation shall be binding on the Debtor under all circumstances and shall be binding upon all other parties in interest, including, without limitation, any Committee and any chapter 7 or chapter 11 trustee that may be appointed or elected on behalf of the estates of the Debtor, except to the extent that (i) a party in interest has filed an adversary proceeding or contested matter challenging the extent, validity, perfection, enforceability or priority of the Prepetition Debt or the liens on the Prepetition Collateral in respect thereof, or otherwise asserting any claims or causes of action against the Agent or the Secured Parties on behalf of the Debtor's estates, no later than the date that is forty-five (45) days after the appointment of the Committee of unsecured claimholders under section 1102 of the Bankruptcy Code, but in no event later than sixty (60) days after entry of this Stipulation. If any such adversary proceeding or contested matter is timely commenced as of such date, the admissions contained in this Interim Order shall nonetheless remain binding

15

and preclusive (as provided in this paragraph) except to the extent that such acknowledgments and agreements are expressly challenged in such adversary proceeding or contested matter.

(b)    If no such adversary proceeding or contested matter is commenced as of such date, then (i) the Prepetition Debt shall constitute allowed secured claims, not subject to subordination and otherwise unavoidable, for all purposes in these Chapter 11 Cases and any subsequent chapter 7 cases, (ii) the liens securing the Prepetition Debt on the Prepetition Collateral shall be deemed legal, valid, binding, duly authorized, perfected, not subject to defense, counterclaim, recharacterization, offset of any kind, subordination and otherwise unavoidable, and (iii) the Agent, the Secured Parties, the Prepetition Debt and the liens on the Prepetition Collateral securing the Prepetition Debt shall not be subject to any other or further challenge by any party in interest seeking to exercise the rights of the Debtor's estates, including, without limitation, any successor thereto.

16.    <u>Successors and Assigns</u>. The provisions of this Interim Order shall be binding upon the Agent, the Secured Parties, the Debtor, and their respective successors and assigns (including any trustee hereinafter appointed or elected for the Debtor's estates) and inure to the benefit of the Agent, the Secured Parties and the Debtor and (except with respect to any trustees hereinafter appointed or elected for the estates of the Debtor) their respective successors and assigns.

17.    <u>13 Week Cash Flow</u>.  No later than September 15, 2017, but in any event within 3 business days prior to any hearing on the Final Order, the Debtor shall deliver to the Agent a draft of a 13 week cash flow, which 13 week cash flow (together with variance reporting and compliance covenants to be negotiated between the Agent and the Debtor) shall replace the Cash Collateral Budget in the Final Order.

Stephen R. Harris, Esq., Harris Law Practice LLC, 6151 Lakeside Drive, Suite 2100, Reno, NV 89511, 775-786-7600
Barbara L. Yong, Esq., Robert R. Benjamin, Esq., Caren A. Lederer, Esq., Beverly A. Berneman, Esq., Anthony J. D'Agostino, Esq., Golan Christie Taglia LLP, 70 W. Madison Street, Suite 1500, Chicago, IL 60602, 312-263-2300

18. <u>Unenforceability</u>. If the Court does not approve this Stipulation for any reason, then this Stipulation has no effect, and neither the Stipulation nor any action or procedure taken, nor any statement made, in connection with the negotiation, preparation, formulation or seeking approval of this Stipulation may be referred to by any entity in connection with any proceeding or action, whether in this case or elsewhere.

19. <u>Consent and Mutual Agreement</u>. Whenever any action may be taken under this Stipulation upon the prior written consent of Agent or the prior mutual written agreement of the "Parties", the action may be taken without any further notice or action or order of the Bankruptcy Court.

20. <u>Headings</u>.   The parties acknowledge that the headings set forth herein are for convenience only and shall not be used to limit, define, or interpret the rights and responsibilities of the parties hereunder.

21. <u>Power of Representatives</u>. Any party executing this Stipulation and Approval Order in a representative capacity warrants that he or she is duly authorized and empowered to do so.

22. <u>Survival of Obligations</u>.   Any actions taken pursuant to this Stipulation, including, but not limited to the Debtor's granting of the security interest in and lien on the Post-Petition Collateral in favor of Agent and the Debtor's use of Cash Collateral, shall survive entry of any order that may be entered: (i) confirming any plan in this case; (ii) converting this case to a case under Chapter 7 of the Bankruptcy Code; (iii) dismissing this case; or (iv) granting Agent relief from the automatic stay of § 362 of the Bankruptcy Code.   Unless otherwise ordered by the Bankruptcy Court, the security interests and liens on the Post-Petition Collateral continue in full force and effect and maintain their priority until all the obligations

owed under the terms of the Prepetition Loan Documents and this Stipulation are paid in full. Nothing in this Stipulation shall in any way prejudice or compromise any rights that Agent has against parties other than the Debtor and nothing herein shall constitute a waiver of any default under the Prepetition Loan Documents or otherwise result in a waiver of any rights against the Debtor or its property.

23. <u>Binding Effect.</u>  This Stipulation is binding on and inures to the benefit of the Debtor, its estate, any representative of the Debtor or its estate, any Trustee appointed in this case, whether under Chapter 11 or Chapter 7, any Examiner with expanded or special powers to operate the Debtor's business appointed in this case, Agent, insiders of the Debtor and their respective successors and assigns.

24. <u>Reservation of Rights.</u>

(a)    Nothing contained in this Stipulation or Agent's consent to the use of its Cash Collateral shall constitute a determination that Agent is not entitled to additional, different or further adequate protection for continued use of its Cash Collateral.  This Stipulation shall not constitute a concession, acknowledgment, admission or stipulation by Agent or a finding by the Court that Agent's interest in the Prepetition Collateral are "adequately protected" within the meaning of §§ 361, 362, and 363 of the Bankruptcy Code;

(b)    Nothing in this Stipulation shall be construed to limit Agent's right to apply to the Court at any time for modification of this Stipulation, for different, further, or additional adequate protection, for termination of the use of its Cash Collateral, for relief from the automatic stay, or for any other relief.  Nothing in this Stipulation, including the Cash Collateral Budget, shall construe or be construed as a consent, acknowledgment or agreement by Agent to the Debtor's calculations of the value of the Pre-/Post-Petition Collateral and

18

1   nothing herein shall constitute a waiver or estoppel with respect to the right of Agent to dispute

2   the validity or accuracy of any calculation or valuation by the Debtor with respect collateral

3   values or adequate protection based thereon; and

4               (c)      Except as expressly provided for herein, nothing contained in this

5   Stipulation (including, without limitation, the authorization to use Cash Collateral shall impair

6   or modify any claims, rights, or defense available in law or equity to Agent and all such claims,

7   rights, or defenses are fully reserved.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Approved and Agreed as of September 1, 2017:

/s/      *Barbara L. Yong, Esq.*

GOLAN CHRISTIE TAGLIA LLP
Barbara L. Yong, Esq.
HARRIS LAW PRACTICE, LLC
Stephen R. Harris, Esq.
Attorneys for Debtor

/s/      *Gregory Gartland, Esq.*

WINSTON & STRAWN LLP
Daniel J. McGuire
Gregory Gartland
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600
(312) 558-5700 (facsimile)
Attorneys for Bank of America, N.A., as
Administrative Agent

# "Exhibit A"

Sierra Chemical Co.
Case No.: 17-51019-btb
Cash Collateral Budget

| **Revenue** | | $ 2,000,000.00 |
|---|---|---|
| **Expenses** | | |
| Freight | $ | 320,000.00 |
| Cost of Goods Sold | $ | 1,025,000.00 |
| Leases (Sparks, Stockton, Forklifts, Compressors) | $ | 65,000.00 |
| Payroll (Salary and Hourly) | $ | 250,000.00 |
| Payroll Taxes | $ | 21,000.00 |
| Benefits (Medical, 401(k), etc.) | $ | 50,000.00 |
| Utilities | $ | 30,000.00 |
| Insurance | $ | 35,000.00 |
| Outside Services (contracting services, environmental, etc.) | $ | 50,000.00 |
| Repairs and Maintenance | $ | 65,000.00 |
| Travel | $ | 10,000.00 |
| Miscellaneous | $ | 25,000.00 |
| Professional Fees | $ | 15,000.00 |
| Real Estate Taxes | $ | 23,000.00 |
| **Total Expenses** | $ | 1,984,000.00 |
| Net Income | $ | 16,000.00 |

# "Exhibit B"

ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is made as of (Date), by and between Sierra Chemical Co., a Nevada Corporation, Carus Holdings Nevada LLC, a Nevada Limited Liability Company ("SCC" or "Sellers"), and Circle Transport, Inc., a Delaware Corporation ("CTI" or "Seller") (also collectively the "Sellers") and Thatcher Company of California, a California Corporation ("Purchaser").

Recitals

A.  Sellers are engaged in, among other things, the design, manufacture, sale and servicing of certain chemical products (the "Business").

B.  Sellers desire to sell to Purchaser, and Purchaser desires to buy from Sellers, certain assets of the Business to the extent primarily owned, leased, licensed or used by SCC in the Business, upon the terms and conditions set forth below. In addition, Seller CTI desires to sell certain assets of CTI to Purchaser. Purchaser desires to purchase the SCC assets and CTI assets from the Sellers, upon the terms and subject to the conditions set forth below.

Agreement

NOW, THEREFORE, in consideration of these premises and subject to the representations, warranties, covenants and terms and conditions contained herein, and for the consideration provided herein, the parties agree as follows:

I.  **AGREEMENT TO PURCHASE AND SELL.**

1.1  Agreement.   Subject to the terms and conditions contained herein, at the Closing (as hereinafter defined), Sellers shall sell, convey, transfer, assign and deliver to the Purchaser all of the assets and rights of the Sellers used or held for use primarily in the Business, as more specifically identified below.

1.2  Purchased Assets. The Purchased Assets shall consist of all of SCC and CTI's right, title and interest in and to the following assets, properties, rights, privileges and claims owned or leased by SCC, excluding the Excluded Assets as defined in Section 1.3:

(a)  Intellectual Property. All Business Marks, Business Patents, Business Copyrights and Business Trade Secrets as defined in Section 11.12 (i) of this Agreement and listed in Schedule 1.2(a).

(b)  Personal Property. All of the equipment, machinery, tooling, and personal property used by SCC in the conduct of the Business, including by way of example and not as a limitation the property listed on Schedule 1.2(b).

(c)  Inventories and Supplies.  All of the inventory, consisting of raw materials, work-in-process, finished goods, consumable materials, merchandise for resale and spare parts used by SCC or held by SCC for sale in the conduct of the Business including by way of example and not as a limitation that listed on Schedule 1.2(c) ("Inventories & Supplies").

(d)  Contracts. All rights under all agreements, contracts, purchase orders, commitments, licenses and leases used by SCC in the conduct of the Business which are listed on Schedule 1.2(d) ("Assumed Contracts"). Purchaser shall assume, to the extent assignable, the Assumed Contracts.

(e)  Goodwill.   All goodwill and information pertaining to the Business and Purchased SCC Assets, including all records, books, manuals, customer lists, supplier lists, permits, franchises, advertising and sales literature, product testing results and records, and any other operating data.

(f)  Accounts Receivable. All trade accounts receivable due to SCC as of the Closing Date. However, for any accounts receivable collected by Purchaser but not included in the Closing Date Estimated Net Working Capital, shall be reimbursed by Purchaser to Sellers within thirty (30) days of its receipt by Purchaser.

(g)  Other Assets. All other properties, assets, including intangible assets, used primarily by SCC in the conduct of the Business at any time, whether or not currently used by SCC in the conduct of the Business,

1

including, by way of example and not as a limitation, the properties and assets listed on Schedule 1.2(g).

(h) CTI Assets. Subject to the terms and conditions herein, at the Closing CTI shall sell, convey, transfer, assign and deliver to Purchaser certain vehicles, equipment, machinery, tooling, personal property and other Assets of CTI, as more specifically identified in Schedule 1.2(h)_("Equipment").

All of the assets listed above shall be as adjusted to the Closing Date due to SCC conducting the Business in accordance with Section 4.5 ("Purchased Assets").

1.3    Excluded Assets. The Purchased Assets shall not include: cash, deposits, certificates of deposit, bank accounts used in the conduct of the Business, Intercompany Accounts existing at the time of Closing, and any other assets, listed on Schedule 1.3, and such other assets as Purchaser determines at least one (1) day prior to closing in its sole discretion that it does not want to purchase (collectively, the "Excluded Assets").

II.    **OBLIGATIONS AND LIABILITIES.**

2.1    Assumed Liabilities. The Purchaser shall assume as of the Closing Date and thereafter pay and fully satisfy when due all claims, liabilities and obligations:

(i)    resulting from, caused by or arising out of: the use, sale or offer for sale of any Product or Service; the conduct of the Business; or the ownership, lease or use of any of the Purchased Assets by Purchaser, provided, however, that such liabilities, claims or obligations arise out of or are based on events occurring after the Closing Date;

(ii)   arising out of any Assumed Contract;

(iii)  which are set forth in the Closing Net Working Capital Statement, namely Accounts Payable and Container Deposit Liability; and

(iv)   arising under this Agreement, including, without limitation, for taxes allocated to Purchaser (collectively the "Assumed Liabilities").

2.2    Excluded Liabilities. Except as specifically provided in Section 2.1, the Purchaser shall not assume Intercompany Accounts existing at the time of Closing and any other obligations or liabilities of the Seller, whether or not incurred or accrued in connection with the conduct of the Business or the ownership, lease or use of the Purchased Assets, and whether or not reflected on a Schedule to this Agreement (the "Excluded Liabilities").

III.   **PURCHASE PRICE.**

3.1    Purchase Price.    (a) In consideration of the purchase and sale of the Purchased Assets, the assumption of the Assumed Liabilities and the consummation of the transactions contemplated herein, the Purchaser shall: (i) pay to SCC a purchase price equal to the sum of (Amount) $600,000.00 payable by Purchaser on the Closing Date, (ii) pay to CTI a purchase price equal to the sum of (Zero Dollars) $0 payable by Purchaser on the Closing Date, (iii) assume the Assumed Liabilities (the "Purchase Price"). The Purchase Price for the SCC assets shall be subject to adjustment as set forth in Section 3.2.

(b) Not fewer than three (3) Business Days prior to the Closing, Seller shall deliver to Purchaser its good faith estimate of the Closing Date Net Working Capital, in substantially the form shown in Schedule 3.1(b). Such estimate, as delivered to Purchaser, is referred to as the "Closing Date Estimated Net Working Capital". The Purchase Price plus the value of the Closing Date Estimated Net Working Capital shall be referred to as the "Estimated Closing Purchase Price".

(c) At the Closing, Purchaser shall pay to Sellers an amount equal to the Estimated Closing Purchase Price by wire transfer of immediately available funds, to such Bank Account as is identified in writing by Sellers.

2

3.2    Purchase Price Adjustment.

(a) Within twenty (20) days after the Closing Date, Purchaser shall prepare and deliver to Sellers a statement identifying its determination of the Closing Date Net Working Capital (the "Purchase Price Adjustment Statement"). In the event that the Closing Date Net Working Capital is greater than the Closing Date Estimated Net Working Capital, Purchaser shall pay Seller an amount equal to the difference between the Closing Date Net Working Capital and the Closing Date Estimated Net Working Capital in accordance with Section 7(e) hereof. In the event that the Estimated Closing Date Net Working Capital is greater than the Closing Date Net Working Capital, Seller shall pay Purchaser an amount equal to the difference between the Estimated Closing Date Net Working Capital and the Closing Date Net Working Capital in accordance with Section 3.2(e) hereof.

(b) Each party shall provide the other party and its representatives with reasonable access to the Business Records and relevant personnel and properties during the preparation of the Purchase Price Adjustment Statement and the resolution of any disputes that may arise under this Section 3.2.

(c) If Sellers disagree with the determination of the Purchase Price Adjustment and the amount of such disagreement exceeds $25,000, Sellers shall notify Purchaser in writing of such disagreement within twenty (20) days after delivery of the Purchase Price Adjustment Statement to Sellers (the "Objection Disputes"). If the total amount of the Objection Disputes is less than or equal to $25,000, the Purchase Price Adjustment delivered by Purchaser shall be final for purposes of this Section 3.2. During the thirty (30) day period of its review, Sellers shall have reasonable access to any documents, schedules or work papers used in the preparation of the Purchase Price Adjustment Statement. The failure of Sellers to deliver written notice of an Objection Dispute to Purchaser within thirty (30) days after delivery of the Purchase Price Adjustment Statement to Sellers shall be deemed acceptance of the Purchase Price Adjustment Statement and agreement to the Purchase Price Adjustment amount by Sellers.

(d) Subject to Section 3.2(c), Purchaser and Sellers shall negotiate in good faith to resolve any Objection Dispute and any resolution agreed to in writing by Purchaser and Sellers shall be final and binding upon the parties. If Purchaser and Sellers are unable to resolve all Objection Disputes within twenty (20) days of delivery of written notice of such Objection Disputes by Sellers to Purchaser, then the disputed matters shall be referred for final determination to an Accounting Arbitrator (the "Accounting Arbitrator") within fifteen (15) days thereafter. Purchaser and Sellers shall jointly select an Accounting Arbitrator from an accounting firm of national standing that is not the independent auditor of (and does not otherwise serve as a Consultant to) either Purchaser and Sellers (or their respective Affiliates). If Purchaser and Sellers are unable to agree upon an Accounting Arbitrator within such time period, then the Accounting Arbitrator shall be an accounting firm of national standing designated by the American Arbitration Association in Denver, Colorado; provided, that such firm shall not be the independent auditor of (or otherwise serve as a Consultant to) either Purchaser or Sellers (or their respective Affiliates). The Accounting Arbitrator shall only consider those items and amounts set forth on the Purchase Price Adjustment Statement as to which Purchaser and Sellers have disagreed within the time periods and amounts and on the terms specified in Section 3.2(c) and Section 3.2(d) and must resolve all unresolved Objection Disputes in accordance with the terms and provisions of this Agreement. The Accounting Arbitrator shall deliver to Purchaser and Sellers, as promptly as practicable and in any event within sixty (60) days after its appointment, a written report setting forth the resolution of any unresolved Objection Disputes determined in accordance with the terms herein. The Accounting Arbitrator shall select as a resolution the position of either Purchaser or Sellers for each Objection Dispute (based solely on presentations and supporting material provided by the parties and not pursuant to

3

any independent review) and may not impose an alternative resolution. Such report shall be final and binding upon all of the parties to this Agreement. Upon the agreement of Purchaser and Sellers or the decision of the Accounting Arbitrator, or if Sellers fail to deliver written notice of disagreement to Purchaser within the thirty (30) day period provided in Section 3.2(c), the Purchase Price Adjustment Statement, as adjusted if necessary pursuant to the terms of this Agreement, shall be deemed to be the Purchase Price Adjustment Statement for purposes of calculating the Purchase Price Adjustment pursuant to this Section 3.2. The fees, expenses and costs of the Accounting Arbitrator shall be borne equally by Purchaser and Sellers.

(e) Any Purchase Price Adjustment shall be paid by Purchaser or Sellers, as applicable, by wire transfer of immediately available funds in United States dollars to an account designated by the party receiving such payment within five (5) Business Days after the final determination of the Purchase Price Adjustment.

## IV.   REPRESENTATIONS AND WARRANTIES OF SELLER.

The Sellers hereby represent, warrant and covenant to and with the Purchaser as follows:

4.1     Organization and Good Standing. SCC and Carus Nevada Holdings are corporations duly organized, validly existing and in good standing under the laws of the State of Nevada, and CTI SCC is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Sellers at all times applicable were and are licensed to do business in all states in which they have conducted or are conducting business and at all times had all necessary Governmental Authorizations.

4.2     Authority and Action.

(a) Capacity. Sellers have all requisite corporate power and authority to enter into this Agreement and each of the other agreements, instruments and other documents to be delivered by it on the Closing Date pursuant to this Agreement (collectively, "Sellers' Documents") and to perfect the transactions contemplated herein and therein.

(b) Authorization. All corporate action required to be taken by Sellers to authorize execution and delivery of this Agreement and Sellers' Documents and to authorize the Sellers to perform and consummate the transactions described herein have been, or prior to the Closing Date will be, properly taken. This Agreement and each of the Sellers' Documents have been and will be duly executed and delivered by Sellers.

(c) Enforceability. This Agreement and each of the Sellers' Documents constitutes a valid and binding obligation of the Sellers.

(d) No Violation. Except as is expressly set forth in Schedule 4.2(d), the execution, delivery and performance by Sellers of this Agreement and the Sellers' Documents and the consummation of the transactions described herein and therein will not: (i) result in a material breach of any term or condition of, or constitute a default under, or in any manner release any party thereto from any obligation under any Material Contract (as defined in Section 4.8) to which Sellers are now a party constituting a Purchased Asset, or by which the Purchased Assets may be bound or affected; (ii) violate any order, writ, injunction, regulation, statute or decree of any court, administrative agency or governmental body to which Sellers are a party and by which the Purchased Assets may be affected; or (iii) violate any provision of the Certificate of Incorporation or By-laws of Sellers.

4.3     Financial Statements. The Financial Statements of the SCC Business consisting of the balance sheet of the Business as of December 31, 2016 ("Balance Sheet"), constituting Schedule 4.3 were compiled from the books, records and other data of the Sellers in accordance with historical financial and accounting practices of Sellers and in accordance with generally accepted accounting principles. There are no liabilities associated with the Business or the Purchased Assets which are undisclosed or misrepresented.

4

4.4    Purchased Assets. Except as described in Schedule 4.4 attached hereto and subject to the limitations contained herein, Sellers own and will transfer to Purchaser, as specified in Section 1.2, all of the Purchased Assets, free and clear of all Liens, other than Permitted Lien restrictions (the "Liens") and liens for accrued taxes not yet due.

4.5    Inventories and Supplies. The Balance Sheet reflects all Inventory of SCC used and held for use primarily in the operation of the SCC Business as of such date. The value of the Inventory shown on the Balance Sheet has been established in accordance with past practices and procedures of SCC and in accordance with generally accepted accounting principles, consistently applied.

4.6    Intellectual Property. Sellers have not received written notice of and are not aware of any claim challenging the ownership, scope, validity or enforceability of any Intellectual Property.

4.7    Compliance with Laws. Sellers are not in violation of any Laws applicable to the Purchased Assets or the Business nor have Sellers received oral or written notice of any such violation, in either case, that individually or in the aggregate is reasonably likely to constitute a Material Adverse Change.

4.8    Contracts. Schedule 4.8 lists every material contract, lease, agreement or commitment, whether oral or in writing, constituting a Sellers Purchased Asset with an obligation or a benefit in excess of (Twenty-Five Thousand Dollars) ($25,000.00) annually ("Material Contracts"). Except as set forth on Schedule 4.8, to Sellers' knowledge all Sellers Material Contracts may be assigned to Purchaser without the consent, approval, novation or waiver of any third party. Sellers are not in default, and to their knowledge, no event has occurred which with the giving of notice or the passage of time or both would constitute a default, under any Material Contract.

4.9    Litigation. Except as set forth in Schedule 4.9 there is no action, suit, order or proceeding pending or to the knowledge of Sellers threatened against or involving Sellers with respect to or affecting the Purchased Assets or the Business, or relating to the transactions described herein, before any court, agency or other governmental body in each case to the extent that any of the foregoing items involve or would reasonably be expected to involve an amount in excess of (Twenty Five Thousand Dollars) ($25,000.00) Dollars.

4.11    Product Warranties. No Products sold or distributed by SCC prior to the Closing Date are subject to any guarantee or warranty other than standard terms and conditions of sale set forth in Schedule 4.11. Except as set forth in Schedule 4.11, since December 31, 2016, Sellers have not received written notice of any material claim asserting liability arising out of any product manufactured, distributed or sold by SCC, and SCC is not currently performing warranty work with respect to such Products, other than such warranty work as is consistent with prior experience of the Business.

4.12    Tax Representations. With regard to tax obligations of the SCC Business, Seller, in connection with the Business, Sellers represent and warrant as follows:

(a) They have filed all Tax Returns required to be filed and such Tax Returns are in all material respects true, complete and correct and were filed on a timely basis.

(b) They have, within the time and as prescribed by Law, paid all Taxes that are currently due and payable, except for those contested in good faith and for which adequate reserves have been taken.

(c) There are no tax liens on the Purchased Assets except for statutory liens for current Taxes not yet due.

(d) Sellers have complied in all material respects with the provisions of the applicable tax codes both federal and state relating to the withholding of employment related Taxes, as well as similar provisions under any other Laws, and have, within the time and in the manner prescribed by Law, withheld and paid

5

over to the proper Governmental Authorities all amounts required;

(e) Sellers are not a party to any agreement relating to allocating or sharing of Taxes that has not been disclosed on its Tax Returns.

4.13    Conduct of the Business. Except as set forth on Schedule 4.13, Sellers have conducted, and through the Closing Date will continue to conduct, the Business in the ordinary course of business consistent with past practice, and Sellers will not incur liabilities other than in the ordinary course of business consistent with past practice, except that any liability reasonably estimated to be in excess of (Twenty Five Thousand Dollars) $25,000.00 shall require the prior written consent of Purchaser. Since December 31, 2016, there have not been any Material Adverse Changes and Sellers have not:

(a) Sold or transferred any assets, other than inventory sold or products manufactured in the ordinary course of business;

(b) Paid or otherwise satisfied any obligations other than the obligations arising in the ordinary course of business;

(c) Incurred any obligation for or paid for any capital expenditure in excess of (Twenty Five Thousand Dollars) $25,000.00 in the aggregate;

(d) Subjected any of the Purchased Assets to any Lien, other than a Permitted Lien;

(e) Entered into any agreement or commitment with respect to any of the foregoing.

4.14    Environmental Conditions. Except for such matters as listed on Schedule 4.14 herein, there are to Sellers' knowledge no hazardous materials caused by or resulting from Sellers' operation of the Business, in excess of applicable environmental cleanup standards in, on, or about the property that affect any of the Purchased Assets and the Business is not being conducted in violation of any Environmental Law.

4.15    No Consent Required. Except as set forth on Schedule 4.13, no consent, approval, order, authorization of, or declaration, filing or registration with, any person or governmental authority is required to be made or obtained by Sellers in connection with the execution or performance of this Agreement, the documents or the transactions described herein, except for such consents, the failure of which to obtain would constitute a Material Adverse Change on the operating results of the Sellers' Business.

4.16    Customers and Commitments. Schedule 4.16 lists (a) the ten (10) largest customers of and the ten (10) largest suppliers to, SCC during the eighteen (18) month period ended June 30, 2017 (stating for each the dollar volume of sales or purchases, as the case may be). No information has been brought to the attention of SCC that any supplier or customer of SCC intends to cease dealing with the Business, or intends to alter in any material respect the amount of its dealings with the Business in the event of the consummation of the transaction contemplated hereby.

4.17    Employment Matters. With respect to employment matters Sellers make the following representations and warranties:

(a) Except as set forth in Schedule 4.17(b) no employee of SCC employed by the Business, or of CTI is a party to, or is otherwise bound by, any agreement or arrangement, including any confidentiality, non-competition, or proprietary rights agreement that (i) was breached or violated by employment with Sellers or (ii) will adversely affect the performance of his or her duties with Purchaser.

(b) None of Sellers' employees employed in connection with the SCC Business or CTI is represented by a union and there are no pending or, to Sellers' Knowledge, threatened union organizing attempts, work stoppage, union representation elections or unfair labor practice hearings.

(c) Schedule 4.17(d) sets forth a complete and accurate list of all judicial or agency determinations, settlements, complaint conciliation, claims, charges or citations against Sellers since December 31, 2016

6

arising under the National Labor Relations Act, the Fair Labor Standards Act, the Occupational Safety and Health Act, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, the Americans with Disability Act of 1990, 42 U.S.C. § 1981, and any other Law, relating to employment discrimination, occupational safety and health, employee benefits, or wages and hours of employees.

(d) Except as set forth on Schedule 4.17(e), Sellers, in connection with the SCC Business or affecting any employee of the SCC Business, and in connection with the CTI assets, do not sponsor, maintain or contribute to, or have any ongoing obligations with respect to any Employee Benefit Plan or any other plan, program, policy or arrangement for or regarding bonuses, commissions, incentive compensation, severance, vacation, deferred compensation, pensions, profit sharing, retirement, payroll savings, stock options or purchases, stock ownership, phantom stock, medical/dental expense payment or reimbursement, disability income or protection, sick pay or group insurance (any of the foregoing an "Employee Benefit Plan"). With respect to each Employee Benefit Plan of Sellers maintained in connection with the SCC Business or CTI assets, Sellers have operated and currently operate such plans in Material compliance with the plan documents and applicable Law, including without limitation ERISA and the Code (including, but not limited to, Section 4980B thereof and regulations thereunder). Except as set forth on Schedule 4.17 (e), Sellers have no unfunded liabilities or potential contingent or actual multi-employer plan withdrawal Liabilities on account of any Employee Benefit Plan.

4.18    Continuation of Carus Holdings Nevada LLC. Sellers will keep in business the business entity "Carus Holdings Nevada LLC", for a minimum of twelve (12) months after the Closing Date.

4.19    Survival of Representation and Warranties. All of Sellers' representations and warranties set forth in this Agreement, and any amendments to such representations and warranties made prior to the Closing, shall survive the execution of this Agreement and the consummation of the transactions contemplated hereby, for a period of twelve (12) months after the Closing Date.

V.    **REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Purchaser hereby represents, warrants and covenants to and with Sellers as of the date hereof and on and as of the Closing Date, as follows:

5.1    Organization and Good Standing. Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of California.

5.2    Authority and Action

(a)    Capacity. Purchaser has all the requisite corporate power and authority to enter into, execute and deliver this Agreement and each of the other agreements, instruments and other documents to be delivered by it on the Closing Date (the "Purchaser's Documents"), to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.

(b)    Authorization. The execution of this Agreement and the Purchaser's Documents and the performance by the Purchaser of its obligations hereunder and thereunder, have been duly authorized by all necessary corporate action. This Agreement and each of the Purchaser's Documents is or on the Closing Date will have been duly executed and delivered by the Purchaser.

(c)    Enforceability. This Agreement and each of the Purchaser's Documents constitute or on the Closing Date will constitute the legal, valid and binding obligations of the Purchaser enforceable against it in accordance with their respective terms.

(d)    No Violation. The execution and performance by Purchaser of this Agreement and the Purchaser's Documents and the consummation of the transactions contemplated herein and therein will not:

(i) result in the material breach of any of the terms or conditions of, or constitute a material default

7

under, or in any manner release any party thereto from any obligation under, any mortgage, note, bond, contract, indenture, agreement, license or other instrument or obligation of any kind to which the Purchaser is now a party or by which its respective properties or assets may be bound or affected; (ii) violate any order, writ, injunction regulation, statute or decree of any court, administrative agency or governmental body; or

(iii) violate any provision of the Articles of Incorporation or By-laws of the Purchaser.

5.3     No Consent Required. No consent, approval, order or authorization of, or declaration, filing or registration with, any person or governmental authority is required to be made or obtained by Purchaser in connection with the authorization, execution or performance of this Agreement, the documents contemplated hereunder or the transactions contemplated hereby and thereby.

5.4     No Misrepresentation. None of the representations and warranties of Purchaser set forth in this Agreement or any Purchaser Document contains any untrue statement of material fact. To Purchaser's knowledge there is no material fact which has not been disclosed to Sellers that could reasonably be anticipated to materially adversely affect Purchaser's ability to complete the transactions described herein.

5.5     Survival of Representation and Warranties. All of Purchaser's representations and warranties set forth herein or in Purchaser's Documents shall survive the execution and delivery of this Agreement and the consummation of the transactions described herein, for a period of twelve (12) months after the Closing Date.

**VI.     CLOSING.**

6.1     Closing and Closing Date. There shall be a Closing of the purchase and sale described herein (the "Closing"), which shall be held at the offices of SCC in Sparks, Nevada on August 31, 2017 at 1:00pm on the third business day after the satisfaction of all conditions of Closing, or at such other location and on such other date and time as the parties thereto may mutually agree upon in writing (the "Closing Date").

6.2     Seller's Conditions, Actions and Deliveries at Closing. At the Closing, the Sellers shall take the following actions and make the following deliveries:

(a) Purchased Assets; Bill of Sale. The Sellers shall convey the Purchased Assets to the Purchaser by delivery of Bills of Sale in substantially the form of Schedule 6.2(a).

(b) Consents. Sellers agree to attempt diligently to obtain or to cause to be obtained any necessary consents which may be required in order to consummate the transactions described in this Agreement, and Purchaser agrees that it will diligently cooperate with Sellers in obtaining the same, and will take such steps as are reasonably requested by Sellers with respect thereto. If such consents as may be required have not been obtained by the Closing Date and Purchaser shall still elect to proceed with the Closing, this Agreement, to the extent permitted by law, shall constitute an equitable assignment by Sellers to Purchaser of all of the Sellers' rights, benefits, title and interest in and to all leases, contracts and commitments of Sellers which are to be assigned to the Purchaser hereunder, with the Purchaser. Sellers shall deliver to Purchaser copies of all consents obtained in connection with the transfer of Purchased Assets and the Business.

(c) Certificates. Sellers shall deliver to Purchaser certificates of its appropriate officers and secretaries certifying the incumbency of the officers executing this Agreement and Sellers' Documents, certifying the due adoption of corporate resolutions authorizing and approving the execution and performance of this Agreement and all of the transactions contemplated herein, and certifying the current accuracy of Sellers' representations and warranties hereunder in the form of Schedule 6.2(c).

(d) Intellectual Property Assignment. SCC shall assign its rights to the Intellectual Property by delivery of an assignment of patents, trademarks and copyrights in substantially the form of Schedules 6.2(d)(1), 6.2(d)(2) and 6.2(d)(3) respectively.

8

(e) Other Documents. Sellers shall execute and deliver such other documents and instruments as Purchaser or its counsel reasonably deem necessary to consummate the transaction contemplated hereby, including but not limited to:

(i) an Assignment of Equipment Leases, Contracts and Software Licenses in the form attached hereto as Schedule 6.2(e)(i);

(ii) an Agreement Not to Compete in the form attached hereto as Schedule 6.2(e)(ii).

6.3    Purchaser's Conditions, Actions and Deliveries at Closing. At Closing, and subject to the conditions that all Seller representations and warranties are then true, Purchaser shall take the following actions and make the following deliveries:

(a) Purchase Price. Purchaser shall wire transfer to Sellers the payments described herein in immediately available funds to such bank accounts and in accordance with instructions as Sellers shall designate in writing.

(b) Assumption Agreement. Purchaser shall assume the Assumed Liabilities as set forth in Section 2.1 by execution and delivery of an assumption agreement in substantially the form attached hereto as Schedule 6.3(b). However, the Assumed Liabilities will not include liability relating to remediation of environmental matters currently under review by the Nevada Division of Environmental Protection for the Battle Mountain, Nevada site.

(c) Certificates. Purchaser shall deliver to Sellers certificates of its appropriate officers and its secretary certifying the incumbency of the officers executing this Agreement and Purchaser's Documents, the due adoption of corporate resolutions authorizing and approving the execution, delivery and performance of this Agreement and all of the transactions contemplated herein, and the current accuracy of Purchaser's representations and warranties hereunder.

(d) Other Documents. Purchaser shall deliver such other documents and instruments as Sellers or its counsel reasonably deem necessary to consummate the transactions contemplated hereby.

**VII.    EMPLOYMENT AND BENEFIT MATTERS:**

7.1    Scope of Section. Purchaser may offer employment to certain of Sellers' employees prior to or following the Closing Date. Nothing in this Agreement shall be construed as imposing a duty upon Purchaser to offer or agree to employ any of Sellers' employees, nor shall it be construed as an agreement between Purchaser and Sellers to transition the services of any employee to that of the other party. This Section VII contains the covenants and agreements of the parties with respect to (a) the status of employment of employees of the Sellers employed in the SCC Business or by CTI ("Employees") upon the sale of the SCC and CTI assets to Purchaser, and (b) the employee benefits and employee benefit plans provided or covering such Employees. It is understood that Purchaser may offer employment to some or all of Sellers' Employees; however, this Agreement shall not be construed as governing the terms and conditions (for example, compensation and employee benefits) of such offers of employment nor the termination of such employment with Sellers. Nothing herein confers upon any Employee or former employee of Sellers any rights or remedies of any nature or kind whatsoever under or by reason of this Section VII, including without limitation any rights of employment by Purchaser for a specific period, on certain terms and conditions nor any additional rights under or with respect to any benefit plans or policy.

7.2    Employment.

(a) Purchaser, at its discretion, may offer employment to Sellers' employees which would become effective after a termination of their employment with SCC and CTI.

(b) Listed on Schedule 7.2(b)(i) are all employees of Sellers that perform services exclusively or

9

primarily for the Business (each employee required to be so listed a "Business Employee"). With respect to each such employee included thereon, Schedule 7.2(b)(ii) lists: (i) each such person's title or job/position; (ii) each such person's job designation (i.e., salaried or contract); (iii) each such person's location of employment; (iv) each such person's employment status (i.e., actively employed or not actively at work (due to, e.g., authorized leave or absence, etc.)); (v) each such person's annual or hourly base rate of compensation; (vi) any additional compensation otherwise payable to such person or for which such person is expressly eligible; and, if applicable; (vii) any consideration, payment, or benefit to which such person may be entitled upon termination of services to the Sellers; and (viii) any material, individual specific provisions relating to such person's employment (e.g., non-compete agreement, etc.) to the extent permitted to be disclosed under applicable Law.

For the purpose of performing the commitments of this Section 7.2, not later than thirty (30) calendar days after signing this Agreement, Purchaser will confirm the names of the Sellers' employees that it intends to offer employment to. Not later than ten (10) calendar days prior to the Closing Date, Purchaser will offer employment to substantially all of Sellers' employees previously identified by Purchaser in the list of names provided after signing, with such new employment to commence (if accepted) with effect from the Closing and will confirm the list of such employees to Sellers at least five (5) days prior to Closing.

Purchaser's offer of employment will be on Purchaser's standard terms and conditions as applied to similarly situated employees. Purchaser shall bargain in good faith with each prospective employee based upon that employee's skills and experience as evidenced by their time previously employed by Seller.

(c) Hiring Employees. Sellers agree to use reasonable efforts to afford Purchaser reasonable opportunities to review employment and personnel records of Employees, to discuss with Employees terms and conditions of employment with Purchaser as of the Closing Date and to distribute to Hourly Employees and Salaried Employees forms and documents relating to employment with Purchaser.

(d) Compensation Matters. All liability with regard to bonuses or similar payments due to the Employees under any applicable Employee Benefit Plan for any period prior to the Closing Date shall be borne by the Sellers, and such shall be paid by the Purchaser only to the extent there are any specific accruals therefor on the Approved Closing Balance Sheet.

7.3    Retiree Health and Life Insurance Benefits.

(a) Purchaser shall have no liability or obligation on or after the Closing Date for retiree health and life insurance benefits with respect to any benefits accrued by an Employee and his/her dependents and survivors prior to the date such Employee becomes either a Salaried Employee or an Hourly Employee of Purchaser.

(b) Sellers shall retain all of the liability and obligation to provide any retiree health and life insurance benefits owed under any retiree health and life insurance benefits plans, prior practices, policies and procedures interpreting or applying such plans, as may apply to any Employee as of the Closing Date.

7.4    Employee Benefit Plans.

(a) Except as otherwise provided in this Agreement, each employee who becomes a Salaried Employee or an Hourly Employee shall cease to be an active participant in Sellers' benefit plans, and shall become eligible to participate in the benefit plans, policies and arrangements of Purchaser (except for Purchaser's Profit Sharing Plan), subject to the terms and conditions of this Agreement and of such plans, policies and arrangements. Except as provided herein, Purchaser assumes no liability or obligation with respect to, and receives no right or interest in, any of Sellers' Employee Benefit Plans or plan assets. Any termination or other disposition of one or more of the pension plans on or after the Closing Date shall not

10

affect the rights and obligations of the Purchaser and the Sellers hereunder.

(b) Purchaser shall not assume any of the liabilities and obligations of the Sellers' defined contribution plan ("Sellers' 401(k) Plan") or Seller's defined benefit pension plans ("Seller's Pension Plan") for the Salaried Employees or the Hourly Employees ("Collectively Seller's Pension Plans") and Seller shall retain all such liabilities and obligations and related assets in Sellers' Pension Plans, including all oral and written modifications, prior practices, policies and procedures interpreting or applying such plans, as may apply to any Employee as of the Closing Date. Purchaser shall explain fully, as of the Closing Date or date which the employee first starts with Purchaser, whichever is latest, Purchaser's Pension Plan, tax qualified, as defined under ERISA, for Salaried Employees and Hourly Employees. The pension benefits of the Salaried Employees and Hourly Employees under Seller's Pension Plans shall be frozen as of the Closing Date. Pension benefits accrued under Sellers' Pension Plans shall be paid to the Salaried Employees and Hourly Employees by such plans when the benefit distribution eligibility requirements are satisfied thereunder.

(d) Loans from the Sellers' 401(k) Plans made to Salaried Employees and Hourly Employees that are outstanding as of the Closing Date will continue to be administered by Sellers. Purchaser shall not be liable for any failure by Sellers to satisfy the requirements of the Code and regulations thereunder with respect to Sellers' 401(k) Plan. Sellers will not be liable for any failure by Purchaser to satisfy the requirements of the Code and regulations thereunder with respect to Purchaser's 401(k) Plan.

7.5    Welfare Plans

(a) All claims arising out of or relating to (i) services or benefits provided to and (ii) all premiums for insurance coverage applicable to any Employee which has accepted employment by Purchaser (hereafter "Covered Employee") or his/her dependents or survivors under any of Purchaser's Welfare Plans on and after the Closing Date shall be the sole responsibility of the Purchaser, and Sellers shall have no liability for any such claims. Sellers shall remain solely responsible for (x) all claims for expenses incurred for medical services provided before the Closing Date to any Covered Employee, dependent and survivor under Sellers' Welfare Plans and (y) services or benefits provided before the Closing Date to Employees, dependents and survivors under any of Sellers' Welfare Plans, whether or not such claims have been submitted prior to the Closing Date, and Purchaser shall have no liability for any such claims.

(b) Purchaser and Sellers shall cooperate in effecting the provisions of this Section, including but not limited to, the exchange of information, the notification of Covered Employees and providers and preparation of required documentation.

7.6    Indemnification. Sellers and Purchaser each agree to indemnify and hold harmless each other against any and all Liability resulting from any claim by or in respect of a Covered Employee relating to benefits under any pension or welfare benefit plan, policy or practice maintained by the indemnifying party or any of its affiliates, and any and all actions, suits, proceedings, judgments, costs and expenses including reasonable legal fees incident to the foregoing. For purposes of this paragraph, "Claim" shall mean a demand, request, cause of action or other means by which an employee asserts a right to obtain a benefit or privilege.

7.7    WARN Act. Sellers shall be responsible for any notices required to be given on or after the Closing Date pursuant to Section 4980B of the Internal Revenue Code ("COBRA") with respect to group health plan coverage under Sellers' plans and for any payments or benefits required pursuant to COBRA or on account of any violation of any requirement of COBRA by Seller's group health plans.

VIII.    OTHER AGREEMENTS.

8.1    Non-assignable Contracts. To the extent that the assignment hereunder by Sellers to Purchaser of any Material Contract is not permitted or is not permitted without the consent of any other party to the

11

Material Contract, this Agreement shall not be deemed to constitute an assignment of any such Material Contract if such consent is not given or if such assignment otherwise would constitute a breach of, or cause a loss of contractual benefits under, any such Material Contract, and Purchaser shall not assume any obligations or liability thereunder. Without in any way limiting Sellers' obligations to obtain all consents and waivers necessary for the sale, transfer, assignment and delivery of the Material Contracts and the Purchased Assets to Purchaser hereunder, if any such consent is not obtained or if such assignment is not permitted irrespective of consent and the Closing hereunder is consummated, Sellers shall continue to use their reasonable efforts to obtain such consents and shall cooperate with Purchaser in any arrangement designed to provide Purchaser with the rights and benefits (subject to the obligations) under any such Material Contracts.

8.2    Access to Information.

(a) Seller's Access. After the Closing Date, Purchaser will give, or cause to be given to Sellers, during normal business hours, such reasonable access to the personnel, properties, contracts, books, records, files and documents and at the Sellers' expense, copies of contracts, books, records and documents as is necessary to allow the Sellers' to obtain information in connection with the preparation for any audit of the Sellers' tax returns and any claims, demands, other audits, suits, actions or proceedings (whether or not related to taxes) by or against the Sellers as the previous owners and operators of the Purchased Assets and/or the Business. Purchaser agrees to cooperate fully with Sellers after the Closing Date at Sellers' expense with respect to any claims, demands, tax or other audits, suits, actions and proceedings by or against Sellers as the previous owner and operator of the Purchased Assets and/or the Business. Purchaser agrees to preserve and keep all books, records and files of the Purchased Assets and/or Business for a period of two (2) years after the Closing Date, or for any longer period as may be required by law for financial or tax purposes.

(b) Purchaser's Access. After the Closing Date, Sellers will give to Purchaser, during normal business hours, such reasonable access to the personnel, properties, contracts, books, records, files and documents to, for or of the Purchased Assets and/or Business and at Purchaser's expense copies of contracts, books, records, files and documents to, for or of the Purchased Assets and/or Business as is necessary to allow Purchaser to prepare and audit its financial statements or tax returns and to defend against any claims, demands, audits, suits, actions or proceedings by or against Purchaser as the owner and operator of the Purchased Assets and/or the Business. Sellers agree to cooperate fully with Purchaser after the Closing Date at Purchaser's expense with respect to any claims, demands, tax or other audits, suits, actions and proceedings by or against Purchaser as the owner and operator of the Purchased Assets and/or the Business.

8.3    Taxes.

(a) Tax Returns. Sellers shall be liable for filing all Tax Returns and shall pay all Taxes (assessed or unassessed) applicable to the Business and/or the Purchased Assets, in each case attributable to periods (or portions thereof) ending prior to the Closing Date. Purchaser shall be liable for filing all Tax Returns and shall pay all Taxes (assessed or unassessed) applicable to its Business and/or the Purchased Assets, in each case attributable to periods (or portions thereof) beginning on or after the Closing Date. This paragraph shall not apply to Transfer Taxes defined in Section 8.3(c). For purposes of this Section 8.3(a), any period beginning before and ending on or after the Closing Date shall be treated as two partial periods, one ending on the day before the Closing Date and the other beginning on the Closing Date. Purchaser and Seller agree to timely sign and deliver certificates or forms as necessary or appropriate to establish an exemption from (or otherwise reduce) or make a report of such Taxes, including filings required under Section 1060 of the Code or any successor statute thereof, in accordance with the allocation of the Purchase Price on Schedule 3.1.

(b) <u>Purchase Price Allocation</u>. Sellers and Purchaser shall agree as to the allocation of the Purchase Price for tax purposes. Nothing in this Section shall be construed as requiring that either Sellers or Purchaser hire appraisers or otherwise incur out-of-pocket expenses in order to reach agreement as to any of the allocations described above. For this purpose, the Purchase Price shall be equal to the cash Purchase Price plus that portion of the assumed liabilities that are considered assumed liabilities for federal income tax purposes. If agreement on an allocation of the Purchase Price is reached any post-closing adjustments made in accordance with Section 3.2 shall be allocated in accordance with the character of such adjustment, on a basis consistent with such final allocation. Sellers and Purchaser shall prepare and file Form 8594 or such other form or statement as may be required by law, and any comparable state or local income tax forms in a manner consistent with such final allocation. Sellers and Purchaser will adhere to any final allocation for all purposes including any federal, foreign, state, county or local income and franchise tax returns filed by them after the Closing Date, including the determination by Sellers of taxable gain or loss on the sale of the Purchased Assets and the determination by the Purchaser of its tax basis with respect to the Assets.

(c) Sellers shall pay all sales, use, registration, transfer, documentary, stamp, reporting or recording Taxes or fees, including interest and penalties thereon imposed as a result of failure to properly and timely file Transfer Tax returns or documents or pay to the relevant tax authority any such Transfer Taxes, to the extent such Transfer Taxes are imposed or incurred by reason of the transfer of any Purchased Assets or the Business by Seller or Purchaser (collectively, "Transfer Taxes").

## IX.  INDEMNIFICATION.

9.1    <u>Indemnification by Sellers</u>. Sellers agree to indemnify and hold harmless Purchaser, its Affiliates and its and their officers, directors, employees, shareholders, agents and assigns against any and all Liabilities arising out of or incident, relating or attributed to, any of the following:

(a) any breach or violation of the covenants and agreements made by Sellers in this Agreement;

(b) any material inaccuracy in or breach of the representations and warranties made by the Sellers in this Agreement and Seller's Documents;

(c) any of the Excluded Liabilities; and

(d) the operations of Sellers not related to the Purchased Assets and/or the Business.

9.2    <u>Indemnification by Purchaser</u>. Purchaser agrees to indemnify and hold harmless Sellers, their Affiliates and its and their officers, directors, employees, shareholders, agents and assigns against any and all Liabilities, arising out of or incident, relating or attributed to, any of the following:

(a) any breach or violation of the covenants and agreements made by Purchaser in this Agreement;

(b) any inaccuracy in or breach of the representations and warranties made by the Purchaser in this Agreement and Purchaser's Documents;

(c) the Assumed Liabilities;

(d) liabilities (including but not limited to 200% rent) contained in or arising out of Seller SCC's April 1, 2011 lease with SKK Properties, LLC, as amended, and SCC's April 1, 2011 lease with Nevada Ventures, LLC, as amended, to the extent such liabilities arise out of or are related to SCC continuing as a holdover tenant after the September 30, 2017 termination of either such lease, excluding only those liabilities in which SCC's holdover under either lease is caused solely by the actions of SCC; and

(d) the use of the Purchased Assets and the operation of the Business after the Closing Date.

9.3    <u>Limitations</u>. Notwithstanding any other provisions of this Agreement:

(a) No party shall have a liability or obligation to the other with respect to a claim made pursuant to Sections 9.1 or 9.2 except to the extent that the aggregate of all Liabilities exceeds Twenty Five Thousand

Dollars $25,000.00 ("Liability Threshold"), and then only to the extent that the aggregate of all such Liabilities exceeds such Liability Threshold, and provided further that in no event shall either party's excess liability over such Liability Threshold with respect to all claims made pursuant to Section IX exceed Sixty Thousand Dollars ($60,000.00). The limitations contained in this Section 9.3 (a) shall not apply to Sellers if the claim for indemnification arises out of Excluded Assets or Excluded Liabilities or to Purchaser if the claim for indemnification arises out of the Purchased Assets or Assumed Liabilities.

(b) Sellers shall have no liability or obligation to Purchaser for any matter of which Purchaser is aware on the date hereof, or which arises from information or documents made available to Purchaser prior to the date of Closing.

(c) In calculating any amounts payable by pursuant to Section IX the amount payable shall be reduced by any related insurance recoveries and by any payments received by the Indemnitee from third parties who are not Affiliates of the indemnified party.

9.4     Indemnification Procedure.

(a) Any party seeking indemnification hereunder (the "Indemnitee") shall notify the party liable for such indemnification (the "Indemnitor") in writing of any event, omission or occurrence which the Indemnitee determines has given or could give rise to Liabilities which are indemnifiable hereunder ("Notice of Claim"). The Notice of Claim shall be given within sixty (60) days after the Indemnitee becomes aware of its own claim or that of a third party and if the claim arises from a breach of a representation and warranty must, in any event, be given prior to the expiration of the applicable survival period for such representation and warranty. A Notice of Claim shall specify in reasonable detail the nature and particulars of the event, omission or comment giving rise to a right of indemnity and, if Purchaser is the Indemnitee, the Liabilities incurred so that the limitations set forth in Section 9.3 can be determined. The Indemnitor shall satisfy its obligations hereunder, as the case may be, within sixty (60) days of its receipt of a Notice of Claim.

(b) With respect to any third-party claim, demand, suit, action or proceeding which is the subject of a Notice of Claim ("Claim") the Indemnitor shall, in good faith and at its own expense, defend, contest or otherwise protect against any such Claim with legal counsel of its own selection and may settle any such Claim without consent of the Indemnitee. The Indemnitee shall have the right, but not the obligation, to participate at its own expense in the defense thereof through counsel of its choice and shall have the right, but not the obligation, to assert any and all cross claims or counterclaims it may have. If Indemnitor fails to timely defend, contest or otherwise protect against any such Claim, the Indemnitee shall have the right, but not the obligation, to defend, contest, assert cross claims or counterclaims, or otherwise protect against, the same and may make any compromise or settlement thereof and be entitled to all amounts paid as a result of such Claim. In such event Indemnitee shall be entitled to all costs incurred by it in defending such Claims.

9.5     Exclusive Remedy. The indemnity provided in this Section IX shall be the exclusive legal, but not equitable, remedy for any breach of, or failure to comply with, any representation, warranty, covenant or other provision of this Agreement

X.     **FEES AND EXPENSES.** Except as otherwise expressly set forth herein, each party hereto shall bear any and all fees and expenses (including, without limitation, legal, accounting, consulting and other professional fees and expenses) incurred by it in connection with the negotiation and the consummation of this Agreement and the transactions contemplated herein. This provision shall survive any termination of this Agreement.

XI.     **MISCELLANEOUS.**

11.1     Entire Agreement; Amendment. This Agreement, including Sellers' Documents and Purchaser's Documents, constitutes the entire agreement and understanding of the parties hereto with respect to the

14

subject matter hereof and supersedes all prior agreements and understandings of the parties with respect to the subject matter hereof. No representation, inducement, agreement, promise or understanding altering, modifying, amending, taking from or adding to the terms and conditions hereof shall have any force and effect unless the same is, in a single writing, and validly executed by the parties hereto.

11.2    Notices. All notices or other communications required or permitted hereunder shall be in writing and shall be deemed to have been duly given (i) if physically delivered, (ii) if transmitted by fax or other similar means, with subsequent oral confirmation, (iii) five (5) days after having been deposited in the United States mail, as certified mail with return receipt requested and with postage prepaid, or (iv) one (1) business day after having been transmitted to a third party providing delivery services in the ordinary course of business which guarantees delivery on the next business day after such transmittal (e.g., via Federal Express), all of which notices or other communications shall be addressed to the recipient as follows:

      (a)    If to either Seller, to: Carus Group Inc., 315 Fifth Street, Peru, IL 61354

            Attention: Dave Kuzy

            With a copy to: Carus Group Inc., 315 Fifth Street, Peru, IL 61354

            Attn: Legal Department

      (b)    If to the Purchaser, to: Thatcher Company of California, 1905 Fortune Road, Salt Lake City, UT 84104. Attention Craig Thatcher.

The addresses so indicated for any party may be changed by similar written notice.

11.3    Third Party Rights. Except as otherwise provided in Section IX hereof with respect to the indemnification obligations for the benefit of officers, directors, shareholders, agents and assigns, the provisions of this Agreement are intended for the sole benefit of Purchaser and Sellers and shall not inure to the benefit of any other entity or person (other than permitted assigns of the parties hereto) either as a third-party beneficiary or otherwise.

11.4    Assignment. The rights and obligations provided by this Agreement shall not be assignable by any party without the prior written consent of the other parties.

11.5    Bulk Sales Law. Sellers and Purchaser hereby waive compliance by the others with the so-called "bulk sales law" and any other similar laws in any applicable jurisdiction in respect of the transactions contemplated by this Agreement. Purchaser agrees to execute and deliver bulk sales exemption certificates as may reasonably be requested by Sellers.

11.6    Severability. In the event that one or more of the provisions of this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions herein shall not in any way be affected or impaired thereby.

11.7    Captions. The captions and headings of the sections have been inserted as a matter of convenience and reference only and shall not control or affect the meaning or construction of this Agreement.

11.8    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be treated as an original but all of which, collectively, shall constitute a single instrument.

11.9    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware (without regard to its conflicts of law rules).

11.10    Brokers or Finders. Purchaser has made no agreement with any person or taken any action which would cause any person to become entitled to any agent's, broker's, or finder's fee or commission in regard to the transaction contemplated by this Agreement.

11.11    Offset Rights. Each party shall have a right of offset for amounts owed to it against amounts owed by that party under this Agreement.

15

11.12    Certain Definitions. As used in this Agreement the following capitalized terms used in this Agreement have the respective meanings set forth below:

(a) Affiliate - Any Person which, directly or indirectly, controls or is controlled by or is under common control with any other Person. For purposes of this definition, "control" shall mean the possession of sufficient ownership to or the power to direct or cause the direction of the management and policies of such Person, either directly or indirectly.

(b) Code - The Internal Revenue Code of 1986, as amended, and as the same may be amended from time to time, or any successor law, and the rules and regulations promulgated thereunder.

(c) Environmental Law(s) - All federal, state, local and foreign statutes, regulations, ordinances and other provisions having the force or effect of law, all judicial and administrative orders and determinations, all agreements with Governmental Authorities and all common law, in each case concerning public health and safety and pollution or protection of the environment (including those relating to the presence, use, production, generation, handling, transport, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, control or cleanup of any hazardous or otherwise regulated materials, substances or wastes, chemical substances or mixtures, pesticides, pollutants, contaminants, toxic chemicals, petroleum products or byproducts, asbestos, polychlorinated biphenyls, noise, radiation or radon), including, but not limited to, the Resource Conservation and Recovery Act of 1976, the Comprehensive Environmental Response Compensation and Liability Act of 1980, the Federal Water Pollution Control Act, as amended by the Clean Water Act, and subsequent amendments, the Federal Toxic Substances Control Act, each as amended and as now or hereafter in effect.

(d) Environmental Claim(s) - Any governmental or private, or third party claims, actions, suits, proceedings, or arbitration of any kind or nature, absolute or contingent before any Governmental Authority relating to the violation or alleged violation of any Environmental Law.

(e) ERISA - The Employee Retirement Income Security Act of 1974, as amended, and as may be amended from time to time, or any successor law and the rules and regulations promulgated thereunder or any successor law.

(f) Governmental Authority - The United States, any foreign country, and any international or multi-national government or governing body and any state or commonwealth, county, city and political or administrative subdivisions thereof in which any of the Assets are located or which exercise jurisdiction over any of the Assets or the Businesses or over Sellers in connection with or with respect to any of the Assets or the Businesses, and any court, administrator, agency, department, commission, board, bureau or instrumentality, including any utility service provider (whether or not public, quasi-public or private), which exercises jurisdiction over any of the Assets or the Businesses or over Sellers in connection with or with respect to any of the Assets or the Businesses.

(g) Governmental Authorization - All approvals, consents, licenses (including certificates of occupancy, certificates of need, permits, entitlement, waivers or other authorizations issued, granted, given, or made available by or under the authority of any Governmental Authority or pursuant to any Law, required in connection with the ownership, use, operation and/or maintenance of the Assets or the conduct of the Businesses.

(h) Hazardous Substances – Any substance, including asbestos or any substance containing asbestos, which is deemed hazardous under any Environmental Law, flammable explosives, radioactive materials, chemicals, pollutants, effluents, contaminants, emissions or related materials and items

16

included in the definition of hazardous or toxic wastes, materials or substances under, or regulated by any Environmental Law.

(i) <u>Intellectual Property</u> - Any and all of Sellers':

    (i) fictional business names, trade names, service names registered and unregistered trademarks, service marks, and applications, which are used or held for use (as licensee, licensor or otherwise) in connection with the Business and/or Purchased Assets and all confusingly similar variations thereof (collectively, "Business Marks");

    (ii) patents, patent applications, including amendments or applications for amendments and invention disclosures whether or not listed on Schedule 6.2(d) and discoveries that may be patentable, which are used or held for use in connection with the Business (collectively, "Business Patents");

    (iii) copyrights in both published and unpublished works, used or held for use in connection with the Businesses (collectively, "Business Copyrights");

    (iv) know-how, trade secrets, confidential information, customer lists, supplier lists, pricing data, software, technical information including test results, data, process technology, plans, drawings, and blue prints, which are used or held for use in connection with the Businesses (collectively, "Business Trade Secrets").

(j) Knowledge or Knowledge of Sellers as used in this Agreement (for example, Sellers' knowledge, knowledge of Sellers or similar) means the actual knowledge of the officers of Sellers described in Schedule 6.2(c).

(k) <u>Laws</u> - All laws, statutes, rules, regulations, ordinances, treaties, principles of common law, orders, moratoria, initiatives, standards, judicial or administrative determinations, decrees or similar edicts or requirements of any Governmental Authority.

(l) <u>Liens</u> - Any mortgage, easement, right of way, pledge, security interest, hypothecation, lien, possibility of reversion, lease or other occupancy agreement, charge, restrictive covenant or claim, condition, equitable interest, option, pledge, right of first refusal, or restriction of any kind, including any restriction on use, voting or dividends (in the case of any security), transfer, receipt of income, or exercise of any other attribute of ownership or other thing commonly known as a lien or encumbrance, excluding any lien created under this Agreement.

(m) <u>Liability</u> - Any expense, loss, obligation or liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including any liability for taxes, and costs incurred by a party for the investigation and defense of a matter, but excluding incidental damages, lost profit, lost business, punitive damages and other consequential damages whether foreseen or unforeseen.

(n) <u>Material Adverse Change</u> - Material Adverse Change" means any event, occurrence, fact, condition or change that, when taken as a whole during the time between execution of this Agreement and the Closing Date, is materially adverse to (a) the business, results of operations, financial condition or purchased assets of the Business, or (b) the ability of Seller to consummate the transactions contemplated hereby; provided, however, that "Material Adverse Change" shall not include any event, occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to: (i) any changes, conditions or effects in the United States or foreign economies or securities or financial markets in general; (ii) changes, conditions

17

or effects that affect the industries in which the Business operates; (iii) any change, effect or circumstance resulting from an action required or permitted by this Agreement; (iv) any matter of which Purchaser is aware on the date hereof, or which arises from information or documents made available to Purchaser prior to the date of Closing; (v) the effect of any changes in applicable Laws or accounting rules, including GAAP; (vi) any change, effect or circumstance resulting from the announcement of this Agreement; or (vii) conditions caused by acts of terrorism or war (whether or not declared) or any natural or man-made disaster or acts of God. or (iii) the ability of Sellers to timely perform as and when due all or any part of its obligations under this Agreement or any document entered into or to be entered into in connection herewith.

(o) Notwithstanding the foregoing section 11.12(n), Material Adverse Change shall not include ( i) changes in generally accepted accounting principles; ( ii) any public announcement of the transactions contemplated by this Agreement; ( iii) the termination or failure to be consummated or completed of any acquisition, joint venture, development project, customer or supplier relationship or other transaction which was not consummated or completed prior to the execution of this Agreement; or (iv) the inability or failure of Purchaser to obtain a lease of at least one of the SCC properties (in Sparks, Nevada and Stockton, California) currently leased by SCC from SKK Properties, LLC and Nevada Ventures, LLC, respectively.

(p) Material – Unless otherwise noted, any event, action, change, condition, agreement, property right, or effect is "material" if such event, change, condition, agreement, property right, or effect is reasonably likely to result in a Liability in excess of Twenty-Five Thousand Dollars $25,000.00.

(q) Occupational Safety and Health Law - Any Law designed to provide safe and healthful working conditions and to reduce occupational safety and health hazards, and any program, whether governmental or private (including those promulgated or sponsored by industry associations and insurance companies), designed to provide safe and healthful working conditions.

(r) Occupational Safety and Health Claim(s) - Any governmental or private, or third-party claims, actions, suits, proceedings, or arbitration of any kind, absolute or contingent before any Governmental Authority relating to the violation of any Occupational Safety and Health Law.

(s) Permitted Liens - Collectively, (i) liens for taxes and assessments not yet past due and payable or delinquent; (ii) unperfected security interests retained by sellers of goods to secure the purchase price of such goods to the extent the obligation to pay such purchase price constitutes a trade account payable incurred in the ordinary course of the Sellers' business; (iii) other liens arising in the ordinary course of business and not incurred in connection with borrowing money that would not be reasonably expected to constitute a Material Adverse Change; and (ii) such other title exceptions or defects as Purchaser may approve, in its sole discretion, in writing.

(t) Person - Includes any manner of association, business trust, company, corporation, estate, governmental or other authority, joint venture, person, partnership, trust or other entity.

(u) Tax - Any tax (including any income, franchise, capital gains, gross receipts, value-added, excise, ad valorem, transfer, stamp, sales, use, property, inventory, occupancy, withholding, payroll, gift, estate or inheritance tax), levy, tariff, impost, duty (including any customs duty), deficiency or fee, and any related charge (including any fine, penalty or interest), imposed, assessed or collected by or for any authority or payable (including any tax-sharing agreement or pursuant to any agreement, arrangement or understanding relating to the sharing or payment

18

of any such tax, levy, assessment, tariff, impost, imposition, toll, duty, deficiency or fee).

    (v)   Tax Return – Any return, report, statement, schedule, notice, form, or other document or information filed with or submitted to, or required to be filed with or submitted to, any Governmental Authority in connection with the determination, assessment, collection or payment of any Tax or in connection with the administration, implementation, or enforcement of any legal requirement relating to any Tax.

11.13    Arbitration. In the event of any dispute between Purchaser and Sellers with respect to the matters set forth in this Agreement, the parties shall first use their best efforts to resolve such dispute among themselves. If the parties are unable to resolve the dispute within thirty (30) calendar days of initiation of such procedure, the dispute shall be settled solely by arbitration as hereafter provided. Within ten (10) calendar days after receipt of written notice from one party that it has exhausted its efforts noted above and is submitting the matter to arbitration, each party shall designate in writing one arbitrator to resolve the dispute who shall, in turn, jointly select a third arbitrator within twenty (20) calendar days of their designation. The third arbitrator will be selected in accordance with the procedure established by the American Arbitration Association under its arbitration rules for commercial disputes. The arbitrators so designated shall each be a lawyer experienced in commercial and business affairs who is not an employee, consultant, officer or director of any party hereto or any Affiliate of any party to this Agreement and who has not received any compensation, directly or indirectly, from any party hereto or any Affiliate of any party to this Agreement during the two (2) year period preceding the Closing Date. The arbitration shall be governed by the rules of the American Arbitration Association for commercial disputes, provided that the arbitrators shall have sole discretion with regard to admissibility of evidence and shall have no authority to award damages not authorized in this Agreement. The arbitrators shall use their best efforts to rule on each disputed issue within thirty (30) calendar days after completion of the hearings. The determination of the arbitrators as to resolution of any dispute shall be binding and conclusive upon all parties. All rulings of the arbitrators shall be in writing, shall contain findings of fact and conclusions of law and shall be delivered to the parties. Each party shall pay the fees of its respective designated arbitrator and its own costs and expenses incurred in connection with the arbitration. The fees of the third arbitrator and any other costs and expenses of arbitration shall be paid fifty percent (50%) each. Any arbitration pursuant to this Section 11.13 shall be conducted in a venue acceptable to both parties

11.14    Schedules. The disclosure of any item on any Schedule or Exhibit to this Agreement will be deemed to be disclosure of such item for all purposes of this Agreement, including, without limitation, a disclosure of such item on each other Schedule and Exhibit to this Agreement. Any matter included in any Schedule or Exhibit to this Agreement shall not be considered "material" for purposes of this Agreement or otherwise, solely by reason of its inclusion in such Schedule or Exhibit.

Remainder of Page Intentionally Left Blank

19

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

Sellers                                                    Purchaser

SIERRA CHEMICAL CO.                        THATCHER COMPANY OF CALIFORNIA, INC.

By: _Susan Buchanan_                       By: _Craig N. Thatcher_

Its: _VP CFO_                              Craig N. Thatcher
                                           Its: _President_

CARUS HOLDINGS NEVADA LLC

By: _Susan Buchanan_

Its: _VP CFO_

CIRCLE TRANSPORT, INC.

By: _Susan Buchanan_

Its: _VP CFO_

20